STATE OF CONNECTICUT *v.* DEMETRIUS GREEN
(11147)

PETERS, HEALEY, SHEA, GRILLO and BIELUCH, Js.

Argued May 3—decision released August 14, 1984

*John R. Williams,* for the appellant (defendant).

*Julia D. Dewey,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Patrick J. Clifford,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Demetrius Green, was convicted after a trial to a jury of attempted sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a)[1] and 53a-49 (a). On this appeal, he claims: (1) that the trial court erred in the admission, on the state's case-in-chief, of the defendant's refusal to give the police a written statement which refusal occurred after the defendant was given *Miranda* warnings; (2) that the state "suppressed" a police photo which the victim had told the police resembled the perpetrator of the crime charged; and (3) that the state did not prove him guilty beyond a reasonable doubt of the crime charged.

The jury could reasonably have found the following: At about 7:30 p.m. on September 23, 1979, the defend-

---

[1] General Statutes § 53a-70 (a) provides: " (a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

ant, wielding a handgun, attempted to attack a sixteen-year-old girl in New Haven. The victim was walking from the house of her girlfriend on Washington Avenue to her home on Kimberly Avenue which was nearby. While walking easterly in the dark along the Boulevard near Lamberton Street, the victim saw the defendant walking westerly on the Boulevard coming over a bridge. He crossed the street and walked towards her. The defendant came up to her and said, "[t]urn around and go the other way." She saw that he had a gun and she did as he ordered. Directing her to go into the bushes by a park fence which was on the Boulevard, he told the victim "to lay down and take off [her] clothes." She got on the ground, fumbled with her "pants area" as if she were going to take her pants off but she did not in fact "undo them." While she was lying on her side, the defendant "knelt down . . . on the ground too." The victim was crying, making excuses, telling him she was thirteen years old, that her stomach hurt, and that her brother was coming to meet her "over the bridge." When he first told her to take her clothing off, he put his gun away in his belt, and he began to take his clothing off by starting "to loosen his pants [and] [h]e started to undo his button." She screamed and attempted to get away, but he held her down and hit her on the side of her head with his hand. During this time, he "kept telling [her] to take off [her] clothes." After she made her excuses, "he tried to take [her] pants off" and "he put [the gun] to [her] head" and said that she "was dead." While he was trying to force her pants off, the zipper on her pants broke. He then told her, "Get up. Get out of here." This entire incident lasted about fifteen minutes.

The victim then got up and returned to her girlfriend's house on Washington Avenue. When she reached the front of that house, the defendant was on that street. He turned around and pointed his gun at

her, whereupon she started screaming and he fled. The police were called to the girlfriend's house and the victim's mother also went there.

Shortly thereafter, a police officer took the victim and her mother to police headquarters where a statement was taken from the victim by Detective Nicholas Franco after she had gone through five or six trays of police photos without making a positive identification of her assailant. At the trial, the victim said she had told Franco that one photo "looked like [her assailant]"[2] but that she did not tell Franco that "it was him." Franco testified at the trial that the victim termed the photo "as a possible look alike." At police headquarters that night, Franco made a note of the date of that photo and its number. This photo was not produced before or during the trial.

The victim also gave Franco a description of her assailant while at police headquarters and Franco caused it to be broadcast on the police radio. At about ten o'clock that night, while Franco was driving the victim and her mother home, he received a broadcast from another police officer that he had stopped a person who fitted the description of the victim's assailant.[3] Franco then drove to Congress Avenue and Arch Street where the defendant was with at least two police officers. The victim "positively identified" him as the perpetrator, both from a distance and when the officers brought him over to the police car, at which time she also heard his voice when he asked her whether she was "sure" that he was her assailant.

Leaving the scene, Franco took the victim and her mother home and then he returned to police headquar-

---

[2] She also said at the trial that she picked out that photo "because it looked a little like him," but that it was not the person who attacked her.

[3] The police officer who had stopped the defendant in the vicinity of Congress Avenue and Arch Street, in doing so, told him that "he matched a description of a subject wanted for sexual assault."

ters. At police headquarters Franco spoke to the defendant. He advised the defendant of his *Miranda* rights and then asked him if he wanted to give a formal statement. Franco testified on direct examination during the state's case-in-chief that the defendant said that "he didn't want to give a statement, but it wasn't him and that he was at his mother's house till about 7:30 that night."

I

We take up first the defendant's claim that the state "suppressed" a police photo which the victim stated "looked like" the defendant. The defendant claims that this suppression denied him his fourteenth amendment due process rights. In doing so, he refers to the circumstances that his conviction was based on an out-of-court identification which the court considered "unnecessarily suggestive,"[4] that he was not wearing the trousers described by the victim when he was arrested, and that he did not have the weapon she had described. He therefore argues that the "suppression" of this photo precluded his use of it to impeach the credibility of the victim.

With regard to the photo in question, Franco testified on cross-examination that he did not set this photo aside because it was department practice not to do so unless the viewer made a positive identification. Franco also testified on cross-examination that he had not made any attempt to look for this photo "within the last week or two." During the trial, the state said that

[4] Prior to the start of the trial, the court held a hearing on the defendant's motion to suppress the victim's out-of-court identification of the defendant made when Franco took her to Congress Avenue and Arch Street.

In announcing its decision denying that motion, the court said that while "[the defendant] was not handcuffed, he was in the presence of police officers. That could be construed to be unnecessarily suggestive. But, certainly other factors outweigh any suggestiveness. I think she's made a credible witness." It is clear that the trial court found that her identification was reliable. This finding has not been challenged on appeal.

it had informed defense counsel "before this case started" that the photo was unavailable, that it had made an attempt to find the photo, but it could not be located.[5]

In *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court said that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See *Moore* v. *Illinois,* 408 U.S. 786, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972). The United States Supreme Court delineated the parameters in *Moore* v. *Illinois,* supra. In *Moore,* the court said that "[t]he heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." *Moore* v. *Illinois,* supra, 794–95. To prevail on a claimed violation of *Brady* and its progeny, a defendant must establish each of these three prongs. See *Moore* v. *Illinois,* supra, 794–95; *State* v. *Doolittle,* 189 Conn. 183, 197, 455 A.2d 843 (1983); *People* v. *Hedrick,* 192 Colo. 37, 40–41, 557 P.2d 378 (1976).

In *United States* v. *Agurs,* 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the court further elaborated on the materiality prong, stating that the prosecutor does not violate his constitutional duty of disclosure "unless his omission is of sufficient significance to result in the denial of the defendant's right

---

[5] An examination of the record before us does not disclose any pretrial motion for exculpatory evidence by the defendant.

to a fair trial." In illuminating the proper standard of materiality that must be shown, the *Agurs* court said that "if the omitted evidence creates a reasonable doubt [of guilt] that did not otherwise exist, constitutional error had been committed." *United States* v. *Agurs,* supra, 112. Pointing out that this meant that "the omission must be evaluated in the context of the entire record," it went on to note that "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial, [but] on the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States* v. *Agurs,* supra, 112–13. That court, however, also said that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs,* supra, 109–10; see *State* v. *Doolittle,* supra, 197.

Our analysis will proceed on the assumption that the failure of the police to preserve the photo was a "suppression."[6] Under the *Brady* line of decisions, the evidence suppressed must not only be favorable to the defendant, but also material to either his guilt or

---

[6] There is no claim that the state deliberately or in bad faith suppressed the photo involved. Only an intentional or deliberate suppression of evidence is a per se violation of due process sufficient to reverse or nullify a conviction. See *United States* v. *Keogh,* 391 F.2d 138 (2d Cir. 1968). There is no doubt of the "constitutional obligation of a prosecutor to disclose all material evidence favorable to an accused in his possession, an obligation that exists without statutory or practice book mandates." *State* v. *Packard,* 184 Conn. 258, 277, 439 A.2d 983 (1981); *United States* v. *Agurs,* 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); see General Statutes § 54-86c; Practice Book §§ 741, 747.

General Statutes § 54-86c requires the state to disclose, "[n]ot later than thirty days" after a defendant pleads not guilty, "any exculpatory information or material . . . whether or not a request has been made . . . ." Because there is not any evidence that shows when the state's attorney

punishment. *Moore* v. *Illinois,* supra, 794–95. Evidence is material if it "could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue* v. *Illinois,* 360 U.S. 264, 271, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). The defendant must show that the evidence was material and of some substantial use to him. *United States* v. *Tomaiolo,* 378 F.2d 26 (2d Cir.), cert. denied, 389 U.S. 886, 88 S. Ct. 159, 19 L. Ed. 2d 184 (1967); see *Talavera* v. *State,* 227 So. 2d 493, 497 (Fla. App. 1969); *Strange* v. *State,* 452 N.E.2d 927, 929 (Ind. 1983). Favorable evidence is that "evidence which . . . might have led the jury to entertain a reasonable doubt about . . . guilt"; *Levin* v. *Katzenbach,* 124 U.S. App. D.C. 158, 162, 363 F.2d 287, 291 (1966); see *United States* v. *Bryant,* 142 U.S. App. D.C. 132, 138, 439 F.2d 642 (1971); and this doubt must be one "that did not otherwise exist." *United States* v. *Agurs,* supra, 112; *Talamante* v. *Romero,* 620 F.2d 784, 789 (10th Cir.), cert. denied, 449 U.S. 877, 101 S. Ct. 223, 66 L. Ed. 2d 99 (1980).

The level of materiality that need be proven here to establish a *Brady* violation is such that "the omitted evidence creates a reasonable doubt [as to guilt] that did not otherwise exist . . . [and] the omission must be evaluated in the context of the entire record." *United States* v. *Agurs,* supra, 112; *State* v. *Packard,* 184 Conn. 258, 279, 439 A.2d 983 (1981). In this case we deem that level to be appropriate in view of the apparently unintentional or, at most, the inadvertent "suppression" of the missing photo.

first became aware of the photo, and no evidence that he ever in fact had it, we perceive no per se violation of this statute under the circumstances of this case. It is difficult conceptually to consider the "loss" of this evidence as due to the negligence of the state. In any event, where evidence is inadvertently lost or otherwise unavailable, the fact that a defendant has been denied access to evidence that may be only "arguably favorable" does not mean that his due process rights have been violated. See *Talamante* v. *Romero,* 620 F.2d 784, 788 (10th Cir.), cert. denied, 449 U.S. 877, 101 S. Ct. 223, 66 L. Ed. 2d 99 (1980).

Initially, it seems evident that the missing photo would have had some materiality inasmuch as it might have affected the credibility of the complaining witness. The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that "might well alter the jury's judgment of the credibility of a crucial prosecution witness." *United States* v. *Higgs,* 713 F.2d 39, 42 (3d Cir. 1983); see *Giglio* v. *United States,* 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). We conclude that the materiality of this photo falls short of the level of materiality demanded by *Agurs.* As Justice Marshall recently said, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *California* v. *Trombetta,* U.S. , 104 S. Ct. 2528, 2534, 81 L. Ed. 2d 413 (1984). The defendant had ample opportunity to cross-examine the victim fully and question her reliability before the jury at trial upon the identity of her alleged assailant. He did this after an earlier cross-examination of the victim during the suppression hearing concerning her identification of him. The defendant has not challenged the victim's physical description of him. Despite the victim's fairly comprehensive description of the defendant, the only attack on her identification of him related to her statement that he wore maroon trousers. It is apparent from the evidence that the defendant was wearing brown trousers when apprehended by the police about two hours after the alleged incident.[7]

The defendant argues that the missing photo was crucial because the state's case was weak and essentially consisted of the victim's testimony. Indeed, it is com-

---

[7] The trousers taken from the defendant were marked as an exhibit at the trial. When she was shown these at the trial, she said they were brown. No issue has been raised as to the shirt and sweater of the assailant which were also exhibits.

mon knowledge that such offenses are seldom undertaken in public view or in the presence of witnesses. *State* v. *Gionfriddo,* 154 Conn. 90, 96, 221 A.2d 851 (1966); *State* v. *Coulombe,* 143 Conn. 604, 608, 124 A.2d 518 (1956); *State* v. *Chuchelow,* 131 Conn. 82, 83, 37 A.2d 689 (1944). The credibility of the complaining witness may be critical in many of these cases; sometimes it may be the only evidence of the commission of the crime. We, therefore, have said that a broad latitude should be allowed to test the veracity of such a witness. See, e.g., *State* v. *Gionfriddo,* supra; 81 Am. Jur. 2d, Witnesses § 492. An assertion that a case is weak does not require an appellate court to upset a verdict of guilty if the evidence affords the trier of the fact a proper basis for its verdict.

We are aware that the requirements of *Brady* and its progeny are imposed because "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady* v. *Maryland,* supra, 87. On balance, we cannot conclude that the defendant was treated unfairly, particularly because he has not shown that "the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States* v. *Agurs,* supra, 112; see *State* v. *Doolittle,* supra, 197.

## II

We take up next the defendant's claim that the state's introduction of evidence in its case-in-chief of the defendant's refusal to give a written statement after having been arrested and given his *Miranda* rights was plain error and a violation of his federal and state constitutional rights.[8] We do not agree.

---

[8] Although this evidence came in at the trial without objection or exception, we will review it under the second "exceptional circumstance" of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), where the record ade-

On the state's case-in-chief, Franco testified that after the defendant had been arrested, processed at police headquarters and given his *Miranda* rights for the second time that night, he asked the defendant if he wanted to give a written statement. The defendant refused.[9] At the trial, the defendant's mother testified that Franco had called her sometime after 7:30 p.m. on the night in question and that she had told him that the defendant had left her house on Lilac Street after 7:30 p.m.[10]

The defendant cites *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), to support his

quately supports the claim that a litigant has been clearly deprived of a fundamental constitutional right and a fair trial.

[9] The transcript discloses that at that time the following took place:

"A. . . . I went down and brought him upstairs, asked him if he wanted to give a formal statement.

"Q. Did you advise him of his Miranda Rights before you did this?

"A. Yes, I did.

"Q. What did he say to you?

"A. He told me he didn't want to give a statement, but it wasn't him and that he was at his mother's house till about 7:30 that night.

"Q. Is that what he told you?

"A. That's what he told me.

"Q. And, he would not reduce that to writing in any way?

"A. No.

"Q. Did you have occasion sometime after your conversation with the defendant to call up his mother?

"A. Yes, I did.

"Q. What did she say?

"A. As near as I can recall, I asked if her son was at her house at all. And, she told me that he was, and that he left when it was getting dark about 7:30 or 8 o'clock.

"Q. When you called her up, I assume, you told her who you were, that you were a detective?

"A. I identified myself.

"Q. She said he left when it was getting dark around 7:30 or so?

"A. Yes.

"Mr. Clifford: I have nothing further."

[10] Cross-examination of Franco disclosed that the defendant had told Franco that he lived with his mother on Lilac Street in New Haven which was on "the other side of town from where the incident occurred."

claimed violation of *Miranda* rights.[11] *Doyle* held that a defendant's postarrest silence following receipt of *Miranda* warnings may not be used for impeachment purposes during cross-examination. *Doyle* v. *Ohio,* supra; see *State* v. *Nowakowski,* 188 Conn. 620, 622, 452 A.2d 938 (1982). That decision was based on due process grounds and concluded that it would be fundamentally unfair to advise a defendant of his right to remain silent and then to use the fact of silence against him. *Doyle* v. *Ohio,* supra, 618. The defendant argues that the state, in eliciting this evidence of his alibi defense, did so to show that he would not make a written statement about it and to undermine seriously his alibi, thereby violating his constitutional rights. We do not agree.

In making this claim, the defendant's position is anomalous. He does not object to the testimony of Franco that he orally denied that he was the assailant and that he had an alibi, but he does object to the testimony that he refused to put his oral statement in writing. It is true that the defendant was asked if he wanted to make a written statement. But rather than simply saying that he did not, he gave an unsolicited response. The defendant does not object to the portion of his response which is beneficial to his defense; he does object, however, to that portion which he claims is not beneficial. His answer to Franco above and beyond his declaration that he would not give a written statement was an unsolicited response. He makes no claim about the voluntariness of his response. The defendant makes

---

[11] The defendant also argues that the state's conduct here violated article first, § 8 of the Connecticut constitution. He relies on *State* v. *Ferrone,* 97 Conn. 258, 116 A. 336 (1922), and *State* v. *Bates,* 140 Conn. 326, 99 A.2d 133 (1953). We reject this claim based on the same analysis we set forth in rejecting his claim based on *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

no claim that the police interrogated him after he invoked his *Miranda* rights. See *Michigan* v. *Mosley,* 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

While the circumstances of this case disclose that there was no impeachment of the defendant personally as a witness, we, nevertheless, deem the *Doyle* analysis helpful because of the alleged "impeachment" of the defendant by the state on its case-in-chief. See *Chapman* v. *United States,* 547 F.2d 1240, 1248 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977). *Doyle* pointed out that "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle* v. *Ohio,* supra, 617. Moreover, that court opined that the implicit assurance given by the *Miranda* warnings that silence will not be penalized would render it "fundamentally unfair and a deprivation of due process to allow the arrested person's *silence* to be used to impeach an explanation subsequently offered at trial." (Emphasis added.) *Doyle* v. *Ohio,* supra, 618. In this case, unlike *Doyle,* the defendant's "silence" was not used by the state. Indeed, the defendant's claim that his silence was protected by *Doyle* was not *"Doyle-*silence" at all because, having been advised of his *Miranda* rights, he decided not to stay silent but voluntarily chose to declare he was not the perpetrator and that he had an alibi. He chose to do this despite his initial response that he would not give a written statement. Franco's direct testimony, therefore, hardly brought forth any inference of an alibi fabricated "somewhere along the way" well after arrest and before trial to offset such an exculpatory position at trial as in *Doyle.* See *State* v. *Zeko,* 177 Conn. 545, 418 A.2d 917 (1979). If anything, it had quite the contrary effect. The state not only brought out Franco's call to the defendant's mother the very night of his arrest, but the testimony of the defendant's mother completely

corroborated the defendant's alibi; this is hardly an undermining of his alibi claim. It is clear that this claimed violation of *Doyle* is without merit. Due process in general, and explicitly in *Doyle,* is concerned with fundamental fairness, and we find no deprivation of that here.

### III

Finally, the defendant argues that the state failed to prove beyond a reasonable doubt that he was guilty of the crime charged. He claims that the state did not present any direct or indirect evidence of any kind to establish that the crime attempted involved sexual intercourse as defined by General Statutes § 53a-65 (2). It is also claimed that if the intent of the perpetrator as described by the victim "was to have sexual contact," the crime would have been attempted sexual assault in the third degree, i.e., General Statutes § 53a-72a, rather than the crime of which he was convicted. Further, he maintains that there was no evidence from which he could have been convicted. This requires, the defendant concludes, the reversal of his conviction with direction to enter a judgment of not guilty. We do not agree.

Under General Statutes § 53a-49 (a), "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; *or* (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." (Emphasis added.) Essentially, an attempt under

§ 53a-49 (a) is an act or omission done with the intent to commit some other crime. The rationale is that while a defendant may have failed in his purpose, his conduct is, however, criminally culpable, and if carried far enough along causes a sufficient risk of harm to be treated as a crime in and of itself. See, e.g., Hall, "Criminal Attempt—A Study of Foundations of Criminal Liability," 49 Yale L.J. 789, 816 (1940). The act or acts must be something more than mere preparation for committing the intended crime; they must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the actor at least to be possible of commission by the means adopted. *State* v. *Mazzadra,* 141 Conn. 731, 736, 109 A.2d 873 (1954).

In this case, the trial court charged the jury on the alternative bases of attempt contained in subsections (1) and (2) of § 53a-49 (a), both of which require proof of the element of intent.[12] Under our penal code, "[a] person acts 'intentionally' with respect to a result or

---

[12] General Statutes § 53a-49 provides in part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or

to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." General Statutes § 53a-3 (11). The state must prove that the defendant acted with the specific intent to commit sexual assault in the first degree which in turn included the intent to have sexual intercourse.[13] "It is not enough [just] to show that the defendant intended to do some unspecified criminal act." LaFave & Scott, Criminal Law § 59, p. 429. Also, it must be proven that a defendant conducted himself to carry out that intent. "Since a determination of the defendant's intent involves an examination of his mental state . . . it necessarily must be proved by his statements or actions." (Citations omitted.) *State* v. *Holley,* 174 Conn. 22, 25–26, 381 A.2d 539 (1977). This is one way of saying that a person's intention is to be inferred from his conduct and the surrounding circumstances. "Where there is sufficient evidence to support a reasonable inference that the defendant intended to commit the crime charged, whether such an inference should be drawn is properly a question for the jury to decide." *State* v. *Morrill,* 193 Conn. 602, 609, 478 A.2d 994 (1984).

---

fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime."

The court's instructions to the jury have not been challenged on appeal and are, therefore, assumed to be adequate and legally correct. *Vogel* v. *Sylvester,* 148 Conn. 666, 668, 174 A.2d 122 (1961).

[13] See footnote 1, supra.

General Statutes § 53a-65 (2) provides that: " 'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body. Its meaning is limited to persons not married to each other."

The question thus becomes whether the jury, considering the defendant's conduct and all the surrounding circumstances, could conclude that there was no reasonable doubt that the defendant acted with the intent to commit sexual assault in the first degree. See *State* v. *Tucker,* 181 Conn. 406, 417, 435 A.2d 986 (1980). The state must prove every essential element of the crime beyond a reasonable doubt and, while the jury may draw reasonable and logical inferences, it may not resort to speculation. *State* v. *Tucker,* supra; *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979). In reviewing a claim challenging the sufficiency of the evidence, the evidence must be given a construction most favorable to sustaining the verdict reached by the jury. *State* v. *Tucker,* supra, 418; *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978).

"A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . which reasonably causes such person to fear physical injury to such person . . . ." General Statutes § 53a-70 (a). A specific intent to commit sexual assault in the first degree is an essential element of that crime and, on the evidence, the jury could find that proven.

In this case, the defendant, brandishing a handgun, approached a young girl, sixteen years of age, on a street after dark, and told her to turn around and go the other way. He forced her to go into some bushes behind a park fence. He ordered her to lie on the ground and take off her clothes, and despite her excuses and crying, she acted as if to do so. He put his gun in his belt, knelt on the ground, started to "loosen his pants [and] started to undo his button." When she tried to get away, he held her down and struck her. During all this time, the defendant repeatedly told her to take off

her clothes. The defendant attempted to take off her pants and put the gun to her head and told her that "[she] was dead." It is true that he did not say anything to her of his intent, but that is not necessary to establish proof of intent. See, e.g., *State* v. *LaVine,* 68 Wash. 2d 83, 411 P.2d 436 (1966). Under all the circumstances, the jury was justified in finding that the defendant had the specific intent to commit the crime of sexual assault in the first degree. They could reasonably have found that he acted "intentionally" as that is defined in General Statutes § 53a-3 (11).

After finding that the defendant acted with the necessary mental state required, the remaining question is whether the jury could reasonably have found on the evidence that the defendant's conduct was of the nature to constitute the inchoate crime of attempt as charged. Once the mental state required under the attempt statute in § 53a-49 (a) is found, there are two subsections of that statute under which a defendant may be found guilty. Under the evidence, the jury could have found this defendant guilty under both, although one would have been sufficient. The law recognizes, as it must, that the method of committing or attempting to commit a crime varies with the particular crime involved; some crimes may be attempted or executed with greater instantaneity than others. See *People* v. *Rizzo,* 246 N.Y. 334, 337–38, 158 N.E. 888 (1927). As Justice Holmes once said: "[P]reparation is not an attempt. But some preparations may amount to an attempt. It is a question of degree. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a [crime] although there is still a *locus penitentiae* in the need of a further exertion of the will to complete the crime." (Emphasis in original.) *Commonwealth* v. *Peaslee,* 177 Mass. 267, 272, 59 N.E. 55 (1901); see *United States* v. *Coplon,* 185 F.2d 629, 633 (2d Cir.

1950) (L. Hand, J.). We have said that " 'the attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause.' *State* v. *Wilson,* 30 Conn. 500, 506 [1862]; *State* v. *Enanno,* 96 Conn. 420, 427, 114 A. 386 [1921]." *State* v. *Mazzadra,* supra. In *Mazzadra,* as noted earlier, we also said that "[t]he acts done must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the [defendant] at least to be possible of commission by the means adopted." *State* v. *Mazzadra,* supra, citing 1 Wharton, Criminal Law (12th Ed.) § 221. Each case depends upon its own factual pattern. *State* v. *Mazzadra,* supra.

Under § 53a-49 (a) (1), a defendant acting with the required mental state is guilty of the crime of attempt where he "[i]ntentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be . . . ." On the evidence, the jury could reasonably have found that his intentional conduct, which was beyond mere preparation, was to perform acts and accomplish a result that would constitute the crime charged inasmuch as the circumstances for doing so were, in his belief, accommodating to his criminal purpose. Moreover, under § 53a-49 (a) (2), a defendant with the required mental state is guilty of the crime of attempt when he "intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." To constitute a "substantial step," the conduct must be "strongly corroborative of the actor's criminal purpose." *State* v. *Latraverse,* 443 A.2d 890, 893 (R.I. 1982); *State* v. *Workman,* 90 Wash. 2d 443, 452, 584 P.2d 382 (1978); *State* v. *Woods,* 48 Ohio

St. 2d 127, 132, 357 N.E.2d 1059 (1976). "The application of this standard will, of course, depend upon the nature of the intended crime and the facts of the particular case. A substantial step in . . . robbery . . . may be quite different from that in arson, rape, or some other crime, but this standard properly directs attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime." *State* v. *Latraverse,* supra, 895. This standard shifts the focus from what has been done to what remains to be done. What constitutes a "substantial step" in any given case is a question of fact. *State* v. *Workman,* supra. The "substantial step" standard in § 53a-49 (a) (2) is illustrated in § 53a-49 (b) with some examples of conduct which are "not . . . insufficient as a matter of law" to constitute a substantial step. These examples are not all-inclusive. On the evidence, the jury could reasonably have found that his intentional conduct constituted a substantial step under this subsection.

There is no error.

In this opinion the other judges concurred.