STATE OF CONNECTICUT *v.* TOBIAS ANDERSON
(13303)

PETERS, C. J., HEALEY, CALLAHAN, COVELLO and SANTANIELLO, Js.

Argued December 14, 1988—decision released April 25, 1989

*Jon C. Blue,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Susan C. Marks,* assistant state's attorney, with whom, on the brief, were *Dennis O'Connor,* assistant state's attorney, and *Mary H. Lesser,* deputy assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. In this case, the defendant appeals from his conviction by a jury on charges of kidnapping in the first degree in violation of General Stat-

utes § 53a-92 (a) (2),[1] two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a),[2] sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1),[3] and attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[4] and 53a-70 (a). The jury found the defendant not guilty of one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3). The trial court, *Susco, J.*, sentenced the defendant to a total effective sentence of thirty-five years imprisonment. The defendant raises three claims of error on appeal. We are not persuaded by the first two and do not review the third.

The jury reasonably could have found the following facts. At approximately 12:15 a.m. on November 19, 1985, the victim, L, was working as the assistant man-

[1] General Statutes § 53a-92 (a) (2) provides: "A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function."

[2] General Statutes § 53a-70 (a) provides: A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

[3] General Statutes § 53a-72a (a) (1) provides: "SEXUAL ASSAULT IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person, or (B) by the threat of use of force against such other person or against a third person, which reasonably causes such person to fear physical injury to such person or a third person."

[4] General Statutes § 53a-49 (a) (2) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

ager at a convenience store in Bloomfield. After closing the store at that time, L walked to her car that was parked in front of the store. As she approached the car, she noticed that the door was unlocked. L "thought [that] was weird" because she always locked the car. L looked in the back seat of the car and, noticing nothing unusual, began to enter the car. At that point, she heard a noise, turned around and was confronted by a black male in his early to mid-twenties, about five feet ten or eleven inches tall, of medium build, clean shaven, with a short Afro, wearing a dark, thick jacket, and dark pants. The man appeared to be wearing long gloves and he brandished a knife in his right hand. L believed that the man intended to steal her car so she offered her keys and pleaded to be left alone. The abductor, however, with the knife poised at L's neck, demanded that she get in the front seat of the car on the passenger's side, sit on the floor, and put her head on the passenger's seat and cover her head with her arms.

The man began to drive the car and L hysterically begged for her release so she could go home to her baby. The abductor told her to shut up and she would not be hurt. During a ten minute ride, L occasionally raised her head and looked at the man and out of the window, but he insisted that she keep her head down. Because L was not familiar with Bloomfield, she had no idea where she was.

The abductor stopped the car in a field. L noticed woods on the right side and a building with bright spotlights in the distance. L and the man exited the car and walked to the front of it; the man was still wielding his knife. The man ordered L to take off her pants, but she refused. He then shoved her against the car and told her to do as he said and she would not get hurt. L slowly removed her pants trying to stall and the assailant again pushed her against the car. After

removing his pants and underwear, and with his knife still in his hand, the man pushed L onto the hood of the car, got on top of her, and engaged in vaginal intercourse. After L's repeated begging for the man to put his knife down, the assailant put the knife down on the hood out of L's reach, and then he lifted up L's shirt and bra and touched her breasts. This episode lasted about ten minutes and during this time L again had occasion to see the man's face.

The assailant then forced L to turn over on the hood and he engaged in vaginal intercourse from behind. L did not remember exactly how long this lasted, but testified that this act lasted less time than the first. During this act of intercourse, the man said that he wanted to engage in anal intercourse. L testified concerning this episode as follows: "He said something like this wouldn't work or something. He wanted to do it anally. And I said no." Upon her refusal, according to L's testimony, he said: "It was either that or I give him head." L responded that she did not want him to enter her anally because it would hurt too much, so he made her perform fellatio on him. He again had the knife in his hand.

While L was performing fellatio, the assailant again said that "it wouldn't work." He then made her get on her back on the ground and he once again engaged in vaginal intercourse. During this act of intercourse, which lasted approximately twenty minutes, the man put down the knife and sucked on his right thumb. After this act of intercourse, the man then forced her onto her hands and knees and he again engaged in vaginal intercourse from behind. After about ten minutes, he ejaculated.

The two then got dressed, but L could not find her underwear so she just put on her pants. L pleaded for her release and told the man that he could have her

money. With his knife in hand, he took forty dollars from her. They both got back into the car and L resumed her position on the floor of the passenger's side. He again proceeded to drive.[5]

Shortly thereafter, the man stopped the car and demanded more oral sex. L refused, but he pushed her head down and made her perform fellatio. Finally, L told him that she could not do it anymore and that she did not care if he killed her because she believed that he was going to do that anyway. They drove for about ten more minutes and again stopped. The man told L to count to ten, during which time he would leave. He also told her that if she took a left from where they were parked, she would know where she was. The assailant exited the car and L quickly locked the door behind him.

After her asssailant left, L drove until she came upon two police cruisers parked behind a building. L told the officers that she had been raped and provided them with some information. Officer Robert Black of the Bloomfield police department then took L to Mount Sinai Hospital. The physician who examined her at that time testified that the victim said that ''she had been forcibly entered vaginally, orally and attempted rectally.'' Later in the day on November 19, L gave a statement to Detective Peter Crombie at the Bloomfield police department.

On November 20, 1985, L accompanied Crombie to four or five fields. She recognized one of them and Crombie found her underwear there. On November 21, 1985, L met with Crombie at the Bloomfield police sta-

---

[5] L asked her attacker if he was going to let her go but he said that she knew what he looked like. She lied and told him that it was dark and she had not gotten a good look at him. On the assailant's demand, L gave him an old majority card and he told her that he was leaving town, but if she went to the police, he would give the identification card to his ''criminal friends in Bloomfield'' and they would ''get'' L or her daughter.

tion and looked at a photographic array but did not select any photograph as that of her assailant. L also assisted a police artist in making a sketch of her attacker.

After another unsuccessful attempt to identify her assailant from among photographs at the police station, on November 29, Crombie and Detective Richard Cousins went to L's house with nine photographs. L identified one of the photographs, which was of the defendant, as that of her assailant and she signed the back of it. L again gave a statement to Crombie after she identified the photograph. At trial, L identified the defendant as her assailant.[6]

At trial, Crombie testified about his questioning of the defendant on November 27 at about 9 a.m., indicating that during their discussion, "[a]ll of a sudden [the defendant] just came out with 'it just happened.' " Upon further inquiry by Crombie, the defendant described his assault of a woman at about midnight on November 18–19 at a convenience store in Bloomfield. Crombie testified that the defendant stated that he had "tried to enter her anally," but she said that she did not want to and he then gave her a choice between anal and oral sex. Crombie also testified that the defend-

---

[6] During the trial, Officer Robert Black testified about his encounter with L when she approached him just after the assault. His testimony showed that her description of the assailant on November 19 was consistent with her description of the assailant at trial.

Dectective Richard Cousins testified about his arrest of the defendant on the night of November 26, 1985, and his questioning of the defendant on November 27. Cousins also testified about L's identification of the defendant's photograph at her house on November 29.

Michael A. Pepi, a resident physician in obstetrics and gynecology at Mount Sinai Hospital, testified that he examined L on November 19, 1985. In addition to testifying that L told him that she had been "forcibly entered vaginally, orally and attempted rectally," he testified that L was very upset, disheveled and had several abrasions in her vagina as well as abrasions on both knees. There was a white discharge present in L's vagina and that discharge contained motile sperm.

ant admitted to sucking his thumb when he was nervous and he told Crombie that he was not wearing gloves during the assault but that he had dress socks over his hands.[7]

In his defense, the defendant offered the testimony of a friend and the friend's mother who testified that the defendant was working on a car at the friend's house until 11 p.m. on November 18. A work associate testified that he spoke with the defendant on the telephone for about ten minutes at 11:30 p.m. on November 18 and that the defendant appeared normal when he arrived at work at 8 a.m. the next day. Another work associate testified that the defendant was at work on November 19 at 8 a.m. The defendant did not testify.

I

The defendant's first claim of error is that his conviction and punishment for attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) violates the double jeopardy clause of the fifth amendment to the United States constitution and the due process clause of the Connecticut constitution, article first, § 8.[8] The defendant contends that his conviction and punishment for attempted sexual assault amounts to multiple punishments for the same offense, given that he had also been convicted of three counts of completed sexual assault, and thus violates the protection against double jeopardy.[9] We disagree.

---

[7] The defendant also discussed, among other subjects related to the assault, the forty dollars and the majority card that he took from the victim.

[8] We note that Connecticut does not have an express double jeopardy clause, but we have interpreted our due process guarantees as including protection against double jeopardy. *State* v. *Rawls,* 198 Conn. 111, 113 n.3, 502 A.2d 374 (1985).

[9] The defendant did not raise this claim at trial. Because, however, it implicates the defendant's constitutional right to be protected against double jeopardy, we review it under the second "exceptional circumstance"

In *State* v. *Rawls,* 198 Conn. 111, 502 A.2d 374 (1985), we recited the state of the law with regard to double jeopardy protection against multiple punishments. In *Rawls,* we stated: "The double jeopardy clause of the fifth amendment to the federal constitution protects not only against multiple trials but also against multiple punishments for the same offense. *Brown* v. *Ohio,* 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977) . . . . 'With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the . . . court from prescribing greater punishment than the legislature intended.' *Missouri* v. *Hunter,* 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983). The issue, though essentially constitutional, becomes one of statutory construction. *State* v. *Madera,* 198 Conn. 92, 109, 503 A.2d 136 (1985)." *State* v. *Rawls,* supra, 120.

In addressing legislative intent with regard to multiple punishments for sexual assaults, we have stated that "each separate act of forcible sexual intercourse constitutes a separate crime." *State* v. *Frazier,* 185 Conn. 211, 229, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982), citing 1 F. Wharton, Criminal Law and Procedure (1957) § 304; 65 Am. Jur. 2d, Rape § 106. Thus, each act of sexual assault is punishable separately. Likewise, an attempted act of sexual assault is punishable separately.[10] See *State* v. *Giannotti,* 7 Conn. App. 701, 709, 510 A.2d 451, cert. denied, 201 Conn. 804, 513 A.2d 700 (1986). With this legislative intent to punish each act or attempted act of intercourse in mind, the dispositive question on this issue becomes whether the jury

articulated in *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), and *State* v. *Wright,* 197 Conn. 588, 592 n.6, 500 A.2d 547 (1985).

[10] Under General Statutes § 53a-51, an attempted crime is deemed to be a separate crime of the same grade and is punishable to the same degree as the most serious crime which is attempted, except that an attempt to commit a class A felony is considered a class B felony.

reasonably could have found that an attempt to commit sexual assault in the first degree, separate from any completed offense, occurred.

Under General Statutes § 53a-49 (a) (2), "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." "The act or acts must be something more than mere preparation for committing the intended crime; they must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the actor at least to be possible of commission by the means adopted." *State* v. *Green,* 194 Conn. 258, 272, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). Furthermore, the actor's intent can be inferred from his or her verbal or physical conduct and the surrounding circumstances. Id., 273. " '[T]he attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause.' " *State* v. *Lapia,* 202 Conn. 509, 515, 522 A.2d 272 (1987), quoting *State* v. *Wilson,* 30 Conn. 500, 506 (1862).

In this case, we conclude that the jury reasonably could have found that the defendant intentionally engaged in a course of conduct that constituted a substantial step in the commission of sexual assault by anal intercourse. The facts adduced at trial established that the defendant forced L, at knifepoint, to engage in vaginal intercourse on the hood of the car. Unsatisfied with this, he made L turn over and engaged in vaginal intercourse from behind. While engaged in vaginal intercourse, the defendant then stated that he wanted to

engage in anal intercourse. From these facts, it was within the jury's province, and was not an abuse of their factfinding discretion, to find that the defendant's conduct and the attendant circumstances amounted to a substantial step in the commission of sexual assault by anal intercourse.[11] We will not disturb the jury's finding on this issue where the defendant by verbal conduct had expressed his intent to engage in anal intercourse, by physical conduct had threatened the victim with a knife and already had forced the victim to submit to vaginal intercourse in two different positions, and where the surrounding circumstances of the incident were that the defendant had abducted this stranger and taken her to a field after midnight.[12] It is of

---

[11] "What constitutes a 'substantial step' in any given case is a question of fact," and thus is properly left for the jury to decide. *State* v. *Green,* 194 Conn. 258, 277, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985).

[12] We view our decision in upholding the conviction for attempted sexual assault in this case as consistent with previous holdings of this and other courts. See, e.g., *State* v. *Lapia,* 202 Conn. 509, 516, 522 A.2d 272 (1987) (requesting oral sex and tightening ropes binding victim sufficient for attempted sexual assault conviction); *State* v. *Upshaw,* 7 Conn. App. 257, 261, 508 A.2d 791, cert. denied, 201 Conn. 803, 513 A.2d 698 (1986) (sufficient evidence for conviction of attempted sexual assault in the first degree where the defendant forced his leg between the victim's legs with sufficient force to bruise her genital area, declared his intention to assault victim "a lot of times," declined to release her for money, attempted to take her to a secluded area, restrained her and covered her mouth to keep her from screaming); *Johnson* v. *State,* 473 So. 2d 652, 657 (Ala. Crim. App. 1985) (sufficient evidence for conviction of attempted rape in the first degree where defendant, holding a knife, told victim to get on hands and knees or he would cut her, exposed himself and said he that wanted to "f---" her and that he wanted a "blow job," and jerked her pants down, but victim refused and defendant left); *Johnson* v. *State,* 144 Ga. App. 568, 569, 241 S.E.2d 458 (1978) (sufficient evidence for conviction of criminal attempt to commit rape where defendant grabbed the victim at the waist, said he wanted to "screw" her but fled after someone approached); see also *People* v. *Satchell,* 94 Ill. App. 3d 422, 430, 418 N.E.2d 1063 (1981); *Thomas* v. *State,* 519 N.E.2d 143, 144–45 (Ind. 1988); *State* v. *Newman,* 408 N.W.2d 894, 896, 900 (Minn. App. 1987); *People* v. *Troy,* 119 App. Div. 2d 880, 882, 500 N.Y.S.2d 436 (1986); *State* v. *Walton,* 90 N.C. App. 532, 534, 369 S.E.2d 101 (N.C. App. 1988).

no consequence that after L's refusal to submit to anal intercourse, the defendant gave her a "choice" between anal and oral intercourse. The fact that the defendant's apparent original goal of engaging in anal intercourse was thwarted by the victim's actions does not mitigate liability for the attempt. F. Sayre, "Criminal Attempts," 41 Harv. L. Rev. 821, 847 (1928); see *State* v. *Lapia,* supra. The jury reasonably could have found that prior to the "choice," the attempt was completed.

Therefore, we are not persuaded by the defendant's claim of error on double jeopardy grounds. Our prior holdings make it clear that multiple punishments for separate acts or attempted acts of sexual assault occurring within a single "crime spree" in violation of the same statute are constitutionally permissible. In this case, we will not disturb the jury's finding that the defendant took a substantial step toward sexually assaulting L by anal intercourse.

## II

The defendant's next claim is that the trial court erred in permitting the state to amend the bill of particulars after the conclusion of final arguments. We conclude, however, that the trial court acted within its discretion in permitting the amendment.

Amendment of a bill of particulars once a trial has begun is governed by Practice Book § 624, which provides: "After commencement of the trial for good cause shown, the judicial authority may permit the prosecuting authority to amend the information or indictment at any time before a verdict or finding if no additional or different offense is charged and no substantive rights of the defendant would be prejudiced. An amendment may charge an additional or different offense with the express consent of the defendant."[13] We have stated

[13] Although Practice Book § 624 is written in terms of amendments to informations or indictments, it also is applicable to an amendment to a bill

that the purpose of this provision is to protect a criminal defendant's right to fair notice of the charges against him or her. *State* v. *Jacobowitz,* 182 Conn. 585, 590, 438 A.2d 792 (1981); see *State* v. *Scognamiglio,* 202 Conn. 18, 25, 519 A.2d 607 (1987); *State* v. *Franko,* 199 Conn. 481, 492, 508 A.2d 22 (1986).

Following closing arguments in this case, in the trial judge's chambers, the judge pointed out to counsel that the bill of particulars, with respect to the sixth count of attempted sexual assault in the first degree, alleged that the defendant attempted to compel L to submit to *oral* intercourse. During closing argument and the state's case-in-chief, however, the state's attorney had alleged that the defendant had attempted to compel the victim to engage in *anal* intercourse. The state's attorney represented that it had been his intent to have the bill of particulars allege attempted *anal* intercourse and that the mistake was a typographical error and a result of an oversight in his proofreading.

The in camera discussion between the trial judge and counsel was not transcribed. Thereafter, in court, however, defense counsel did object to a motion by the state to amend the bill of particulars to reflect that the attempted sexual assault count was based on attempted anal intercourse rather than attempted oral intercourse. Defense counsel did not articulate specific grounds for his objection but simply stated that he would take exception "for obvious reasons." In ruling on the state's motion to amend, the trial court stated that it did not see how the defendant would be prejudiced by the amendment. Accordingly, the trial court granted the motion to amend.

of particulars. See *State* v. *Cunningham,* 3 Conn. App. 353, 358, 488 A.2d 834 (1985). The bill of particulars is a factual expansion of the information. See *State* v. *Laracuente,* 205 Conn. 515, 518–19, 534 A.2d 882 (1987), cert. denied, U.S. , 108 S. Ct. 1598, 99 L. Ed. 2d 913 (1988).

There are two elements under Practice Book § 624 that must be satisfied before the trial court may, in its discretion, allow an amendment to a bill of particulars. First, the amendment cannot charge the defendant with an additional or different offense, and second, the substantive rights of the defendant must not be prejudiced. In this case, the defendant concedes that the first element is satisfied. The defendant contends, however, that the second element "is much more problematic."[14]

As noted by the defendant, in *State* v. *Wallace,* 181 Conn. 237, 239, 435 A.2d 20 (1980), we held that no substantive rights of a defendant are prejudiced by an amendment if the defense is one of alibi. See *State* v. *McKnight,* 191 Conn. 564, 587, 469 A.2d 397 (1983). In so holding in *Wallace,* we noted that "the defendant did not dispute the commission of the crime charged, he simply claimed that he was not the one who committed it." *State* v. *Wallace,* supra. In this case, while the evidence offered by the defendant did not place him in another place at the times that the state maintained the crimes charged were committed, his defense at trial was that he was simply not the assailant. In short, according to the defendant, it was essentially a case of mistaken identity. See *State* v. *Huff,* 10 Conn. App. 330, 346, 523 A.2d 906, cert. denied, 203 Conn. 809, 525 A.2d 523 (1987). We do not agree with the defendant's argument that we ought not to invoke *Wallace* in this case.

Although the defendant cites the recent United States Supreme Court case of *Mathews* v. *United States,* 485 U.S. 58, 108 S. Ct. 883, 99 L. Ed. 2d 54 (1988), for the proposition that a criminal defendant may raise inconsistent defenses, we are not persuaded by his argument that *Mathews* should prevent

[14] The amendment also must be based on good cause. See Practice Book § 624. The defendant does not contend that there was not good cause in this case.

us from applying *Wallace* in this case. The court in *Mathews* held that under the federal rules, a criminal defendant who raises an alibi defense also may have the court instruct the jury on the defense of entrapment if there is sufficient evidence from which the jury reasonably could find entrapment. Id., 886. Disposition of the amendment issue in the present case, however, does not center on the *permissibility* of the defendant's raising inconsistent defenses, but turns on whether the defendant had adequate notice of the charges against him and thus the *possibility* of raising inconsistent defenses. Under the circumstances of this case, we conclude that the defendant did have adequate notice of the charges against him and thus the amendment of the bill of particulars did not prejudice his substantive rights.[15]

During the trial, all of the evidence of attempted sexual assault related to attempted anal intercourse. There was no evidence submitted that would have supported a charge of attempted oral intercourse. In addition, during closing argument, the state argued that the defendant had attempted to engage in anal intercourse with the victim. Nevertheless, in his brief, the defendant argues that had the bill of particulars alleged attempted anal rather than oral intercourse, he could have (1) cross-examined the victim to establish the precise details of the attempt, (2) argued in his motion for acquittal that no attempt had been established, and (3)

---

[15] Under the facts of this case, we do not need to rely solely on the *Wallace* rule because we conclude that, independent of that rule, there has not been a showing that the defendant's substantive rights have been prejudiced. Because the defendant had adequate notice of the charges against him, he could have raised inconsistent defenses based on those charges. The defendant did not do so and thus we are not presented with the question of whether the *Mathews* reasoning undermines our rationale in *Wallace* in this situation. *State* v. *Wallace*, 181 Conn. 237, 435 A.2d 20 (1980).

Moreover, we note that at the trial the defendant did not object and except to any of the evidence concerning the attempt at anal intercourse. He also did not take any exception to the court's charging the jury on that issue.

presented the arguments more effectively to the jury. We conclude that the trial court reasonably could have found that the defendant had adequate notice of the charges based on the evidence and arguments during the trial and therefore did not err in finding that the amendment of the bill of particulars did not prejudice him. All of the tactics that the defendant claims he could have employed had there not been an error in the bill of particulars could have been employed based on that adequate notice of the charges and on our rules of practice.[16]

## III

The defendant's final claim is that the trial court erred in failing to instruct the jury that, in order to convict the defendant, they had to find that he had committed the crimes in substantially the manner charged in the bill of particulars and that they had to agree on which acts constituted the crimes. See *State* v. *Kish,* 186 Conn. 757, 763, 443 A.2d 1274 (1982). Because the defendant did not except to the charge at trial, we will not review this claim unless the defendant's constitutional rights were compromised. *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

We note that the trial court, just prior to instructing the jury on each of the crimes charged, told the jury it was "about to charge [the jury] with regard to the offenses with which under the bill of particulars and the information the defendant is charged." It had also told the jury at the outset that "[t]he bill of particulars outlines the state's position as to the particular ways in which it believes the defendant has committed the crimes alleged." It then proceeded to charge the jury specifically on each of the six counts in the information. The defendant had filed no request to charge

---

[16] The defendant could have moved for acquittal up to five days after the verdict was entered. Practice Book §§ 599, 600.

the jury and took no exceptions at all to the instructions. The information and bill of particulars were with the jury during its deliberations.

When the jury returned its verdict on the six counts submitted to it, the clerk inquired as to its verdict on each count. Upon the trial court's order that the verdict on each count be accepted and recorded, the clerk asked the jury six times, once after each count, whether "this is your verdict and so say you *all.*" (Emphasis added.) The transcript indicates that the jury indicated in the affirmative on each of the six inquiries. In the event that the defendant had any question of the unanimity of the verdict on any or all of these counts after this expression of unanimity, he could have, but did not, move to have the jury polled.

The defendant, on this issue, contends that *United States* v. *Gipson,* 553 F.2d 453 (5th Cir. 1977), "expounds a test of conceptual distinctness" and that the court held that "a jury finding of the actus reus element of an offense cannot be considered unanimous if some of the jurors are allowed to think that the defendant committed an act of one conceptual kind while others believe that he has committed a conceptually distinct act." We have had occasion recently to analyze *Gipson* at some length under factual circumstances not wholly similar to this case. See *State* v. *Bailey,* 209 Conn. 322, 333–39, 551 A.2d 1206 (1988). There, quoting *State* v. *Flynn,* 14 Conn. App. 10, 38, 539 A.2d 1005, cert. denied, U.S. , 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988), we noted that the rationale of *Gipson* was as follows: " 'Where a trial court charges a jury that the commission of any one of several alternative acts would subject a defendant to criminal liability, a unanimity charge on a specific act is required only if two conditions are met: (1) the alternative acts are *conceptually distinct* from each other; *and* (2) the

state has presented *supporting evidence* on each alternative act. . . .' (Emphasis in original.)" *State* v. *Bailey,* supra, 334.

The defendant's claim on this branch of the case focuses on the "particularized forms of sexual assault" which he maintains "were, at least in the context of this case, of distinct conceptual kinds." We do not agree. The sexual assaults submitted to the jury did not fall into "two distinct conceptual groupings" so that there was the possibility of "significant disagreement among the jurors as to what [this defendant] did." *United States* v. *Gipson,* supra, 458, 458–59; see *State* v. *Giwosky,* 109 Wis. 2d 446, 436 N.W.2d 232 (1982). As to the sexual assault counts, they were not, in any combination, conceptually distinct; they were conceptually unitary. The jury knew that each act was an act of compelled sexual intercourse, and not a grouping of conceptually distinct acts. The several ways in which sexual intercourse may be committed under General Statutes § 53a-65 (2) are only one conceptual offense. For that reason alone, the *Gipson* criteria are not met.

We also point out that the Fifth Circuit Court of Appeals itself has limited its holding in *Gipson* in *United States* v. *Bolts,* 558 F.2d 316, 326 n.4 (5th Cir. 1977), cert. denied, 434 U.S. 930, 98 S. Ct. 417, 54 L. Ed. 2d 290 (1978), where it said that "*Gipson* involved a situation where the court *expressly* sanctioned a non-unanimous verdict: the jurors were told that they *could disagree* as to what particular prohibited acts were committed, as long as each juror found that one of the acts had been done." (Emphasis added.) See *Fryer* v. *Nix,* 775 F.2d 979, 992 (8th Cir. 1985). We cannot read the instructions in this case in such a manner. Therefore, the defendant's constitutional rights have not been violated.

There is no error.

In this opinion the other justices concurred.