******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* DANIEL B.*

(SC 19788)

Robinson, C. J., and Palmer, D'Auria, Mullins,
Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

Convicted of the crime of attempt to commit murder, the defendant appealed
to the Appellate Court, claiming, inter alia, that there was insufficient
evidence to support his conviction under the statute (§ 53a-49) governing
attempt crimes because the state had failed to prove that his conduct
constituted a substantial step in a course of conduct that was intended
to culminate in the murder of T, from whom the defendant was in the
process of seeking a divorce. The defendant's conviction arose from
his efforts to hire a hit man to kill T. During the defendant's trial, the
jury viewed a video recording in which the defendant is shown meeting
with an individual he believed to be a hit man, agreeing to a price to
have T killed, providing necessary information to effectuate her murder,
and planning the murder. The Appellate Court concluded that a reason-
able jury could have found, in light of that video recording, that the
defendant took a substantial step in a course of conduct intended to
culminate in T's murder, and that the defendant's failure to pay the
individual posing as a hit man did not render his conduct merely prepara-
tory. Accordingly, the Appellate Court affirmed the trial court's judg-
ment, and the defendant, on the granting of certification, appealed to
this court. On appeal, the defendant claimed that the Appellate Court,
in concluding that there was sufficient evidence to sustain his conviction,
improperly construed § 53a-49 (a) (2) by focusing on what already had
been done rather than on what remained to be done to carry out T's
murder. *Held* that the Appellate Court properly concluded that the state
presented sufficient evidence to permit a jury reasonably to find the
defendant guilty of attempt to commit murder: a review of the relevant
language and history of § 53a-49 (a) (2), as well as prior case law interpre-
ting the statute, led this court to conclude that the Appellate Court
properly construed § 53a-49 (a) (2) in determining that the defendant's
actions constituted a substantial step in a course of conduct planned
to culminate in the commission of T's murder by focusing on what the
defendant had already done rather than on what remained to be done
to carry out the murder; moreover, construing the evidence in the light
most favorable to sustaining the verdict, this court concluded that there
was ample evidence from which the jury reliably could have determined
the defendant's intent, including evidence that he had contemplated
murdering T for two years beforehand and had begun planning well in
advance of his meeting with the hit man, that he contacted a third party
in order to obtain contact information for an individual, E, to whom he
had not spoken in years, to inquire about procuring a hit man only four
days before the dissolution of his marriage to T was to be finalized,
that he engaged in a series of texts and phone calls to E over a twenty-
four hour period, and that he then met with the individual he believed
was a hit man, provided him with T's name, the name of T's employer,
her home and work addresses, work schedule, physical description, and
a photograph, discussed the manner and method to best effectuate the
killing, established an alibi, and agreed to a structured payment schedule,
with the first payment to be made approximately ten hours after the
meeting.

(*One justice dissenting*)

Argued September 11, 2018—officially released March 5, 2019

*Procedural History*

Substitute information charging the defendant with
the crimes of attempt to commit murder and criminal
violation of a protective order, brought to the Superior
Court in the judicial district of Stamford-Norwalk and

tried to the jury before *Hudock, J.*; verdict and judgment of guilty of attempt to commit murder, from which the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Beach* and *Bishop, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Philip D. Russell*, with whom were *A. Paul Spinella* and, on the brief, *Peter C. White* and *Michael Thomason*, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo*, state's attorney, and *Maureen Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The present appeal requires us to consider whether, in determining the sufficiency of the evidence to support a conviction for attempt to commit murder under the substantial step provision of General Statutes § 53a-49 (a) (2), the proper inquiry should focus on what the actor had already done or on what the actor had left to do to complete the crime of murder. In the present case, the jury found the defendant, Daniel B., guilty of attempt to commit murder in violation of General Statutes §§ 53a-54a and 53a-49 (a) (2). Following our grant of certification,[1] the defendant appeals from the judgment of the Appellate Court affirming the judgment of conviction. See *State* v. *Daniel B.*, 164 Conn. App. 318, 354, 137 A.3d 837 (2016). The defendant claims that, in concluding that the evidence was sufficient, the Appellate Court improperly construed § 53a-49 (a) (2) to require the substantial step inquiry to focus on "what [the actor] has already done," rather than what "remains to be done . . . ." Id., 332. The state responds that the Appellate Court properly held that the focus is on what the actor has already done and that, when considering the defendant's conduct in the present case, the Appellate Court properly concluded that there was sufficient evidence to sustain the defendant's conviction of attempted murder. See id., 333. We conclude that the determination of what conduct constitutes a substantial step under § 53a-49 (a) (2) focuses on what the actor has already done rather than on what the actor has left to do to complete the substantive crime. We therefore affirm the judgment of the Appellate Court.

The jury reasonably could have found the following relevant facts. In December, 2010, the defendant brought an action seeking the dissolution of his marriage to the victim, T. The couple's relationship subsequently began to further deteriorate, leading T to call the police regarding the defendant four times in two months. T's first call to the police occurred in February, 2011, after T returned home to discover that the defendant had installed a coded padlock on their bedroom door, apparently in an attempt to keep her out of the bedroom.

T called 911 on three additional occasions in March, 2011. On March 6, 2011, while T was watching a movie at her sister's house, she received several phone calls from the defendant, who appeared upset, asking her where she was. When she answered her cell phone near a kitchen window, she "could hear him talking outside before [she] heard his voice coming through the cell phone," and realized he was standing outside her sister's home. On that occasion, an officer with the Stamford Police Department arrested the defendant, and T obtained a partial protective order against him the following day. The next day, on March 7, 2011, after T returned home from her sister's house and she discov-

ered that the defendant had packed away her belongings and left them by the front door, the police were again called. Two days later, on March 9, 2011, T came home to find the defendant moving bedroom furniture and taking her belongings off the bed and other furniture in their bedroom. When T confronted the defendant, an argument ensued during which he shoved her multiple times through the upstairs hallway, eventually attempting to push her down the stairs, causing both her and their three year old son to fall at the top of the staircase. Stamford police arrested the defendant for the second time, and T obtained a full protective order against him. By June, the defendant and T had reached an agreement regarding the dissolution of their marriage.

On June 9, 2011, four days before the dissolution was scheduled to be finalized, the defendant called an old friend, John Evans, to whom he had not spoken in a "couple of years." To obtain Evans' contact information, the defendant requested Evans' phone number from a mutual friend, who called Evans and obtained permission to give his number to the defendant. The record is unclear as to when the defendant made this request and how much time passed before he received Evans' phone number. The record does reveal, however, that between the hours of 12 and 2 a.m. on June 9, the defendant called Evans and requested to meet with him that day at approximately 3 p.m. at a donut shop in Stamford. When they met fifteen hours later, the defendant explained that he was getting divorced from T and she was "getting the house, the kids . . . and she was trying to get some money from him, too." The defendant asked Evans if he "knew anybody that could murder [T]" for him. When Evans tried to dissuade him, the defendant told him that "[he had] been thinking about it for two years, and he made up his mind . . . . He needs it done."

Evans responded that he would "see what [he] could do." Shortly after leaving the defendant, Evans called Mike Malia, a mutual friend who knew the defendant better than Evans did, for advice on how to proceed. Malia told Evans that "when [the defendant] gets something in his head, he's gonna do it. So, you know, make a call, call somebody." Evans called John Evensen, a retired Stamford police officer for whom Evans had acted as a confidential informant in the past, to tell him about the defendant's request. Evensen encouraged Evans to "do the right thing," because "somebody's life" was endangered, and told Evans that he would connect him with someone. Evensen then called James Matheny, then commander of the Bureau of Criminal Investigations for the Stamford Police Department, and arranged for Matheny to contact Evans.

After speaking to Evans himself, Matheny's team formulated a plan that called for Evans to introduce the defendant to an undercover police officer who would

pose as a hit man. As part of the plan, Evans called and texted the defendant, relaying to him that he "found a guy" that would "take care of it ASAP." Through a series of texts and calls beginning at 3:27 p.m. and ending at 12:22 a.m.,[2] the defendant agreed to meet Evans and the hit man at the McDonald's restaurant located at the southbound rest area off Interstate 95 in Darien. The defendant met Evans at approximately 1 a.m., and Evans introduced him to Michael Paleski, Jr., an officer with the Branford Police Department assigned to the New Haven Drug Task Force. Paleski had been engaged by the Stamford police to pose as the hit man. The defendant entered Paleski's vehicle, which was equipped with a hidden video camera that recorded their entire encounter.

While in the vehicle, the defendant and Paleski discussed the manner, method and price to best effectuate T's murder. The first issue the defendant and Paleski discussed was the price Paleski would require to perform the hit. The defendant agreed to pay Paleski $10,000 in the following manner: an $800 payment due the following morning in order for Paleski to obtain a firearm, along with a down payment of $3000, and the remainder due approximately one month after the murder. Next, the defendant told Paleski the information necessary for him to murder T, including her full name, home address, place of employment, and work schedule. The defendant also showed Paleski a photograph of T to help him identify her. When the defendant showed Paleski the photograph of T, the defendant noted that it was an older photograph and that T's hair color had changed.[3] He explained that it was the only photograph of her he had because "she's not fucking big on pictures." The record does not reveal when and how the defendant had obtained the photograph of T. T testified, however, that, one month prior to the meeting between the defendant and Paleski, the defendant had asked T to provide him with a photograph of herself, but she refused.

At the defendant's suggestion, the two agreed to stage T's murder as a carjacking, as demonstrated by the following exchange[4] captured by the video camera:

"[Paleski]: How do you want it done? . . .

"[The Defendant]: I don't know. The only thing I was thinking about was because she drives through—you from Stamford or no?

"[Paleski]: No.

"[The Defendant]: Okay, well she—the hospital is in a rough section and she's got a nice car . . . so I'm like, I don't know if it makes sense, if that would be the best way to go about it.

"[Paleski]: Or you might want to make it look like a carjacking or something?

"[The Defendant]: Something like that . . . take the car, the car is going to get found and it kind of like explains it.

"[Paleski]: Yup.

"[The Defendant]: You know, I'm not sure what's the best thing to do . . . I didn't put that thought into the detail of how.

"[Paleski]: You want her completely out of the picture right? Morte?

"[The Defendant]: [The defendant is nodding.] That's where it's getting to . . . .

"[Paleski]: That's what you want? . . .

"[The Defendant]: I wish we didn't need to be there but . . . you know."

Later in the conversation, Paleski again asked for confirmation that the defendant wanted him to kill T. Paleski told the defendant: "Just so [you] know, I'm going to put two in that bitch's head and take that car and be gone, and I'll fucking burn it somewhere." The defendant responded, "[t]hat's the only way that I can come up with that . . . makes sense . . . ."

Concerned that he would be "the first person . . . [the police] looked at," the defendant believed that the carjacking scenario near T's work would also provide him with an alibi because the defendant would typically have the children with him at one of his aunt's houses. When Paleski confirmed by saying, "I can take the bitch off when you're with [your aunts]," the defendant responded, "[e]xactly." Aware that the police would look at the defendant's actions when investigating T's murder, Paleski and the defendant discussed how quickly the defendant could get the money:

"[Paleski]: I'll do it but I need . . . some of that wood.

"[The Defendant]: Yea.

"[Paleski]: Can you get me the $800 tonight?

"[The Defendant]: I can work it out, yea, I could.

"[Paleski]: Alright.

"[The Defendant]: I just don't want to—for me to get it I got to like disturb people tonight . . . I don't want anything out of place tonight.

"[Paleski]: Okay, but I ain't doing shit without some money.

"[The Defendant]: Understood.

"[Paleski]: Feel me?

"[The Defendant]: Clear. I'm saying to you I'm not asking you for the urgency of tonight, I'd rather do it so it's not—I don't want anything out of character.

"[Paleski]: Right, right.

"[The Defendant]: You know . . . that's my pause for tonight, because it's going to be out of character for me to go get it tonight . . . .

"[Paleski]: How soon do you think you can get that money?

"[The Defendant]: I can get it tomorrow without doing anything . . . out of character."

Paleski told the defendant that, in order to effectuate the carjacking, he needed the defendant to write down T's full name, the make and model of her car, T's place of employment, and her home address. The defendant exited Paleski's vehicle and went to Evans' vehicle to retrieve a piece of paper on which to write down the information. In an apparent effort to distance himself from the crime, the defendant asked Evans to write down the information as the defendant dictated it to him. The piece of paper was admitted into evidence, and Evans testified that he wrote the note.

When the defendant returned to Paleski's vehicle with the note, he handed it to him, and they once again discussed the plan to have T killed near her place of employment at a time when the children were with the defendant. They discussed T's typical work schedule and the defendant's concerns that sometimes her work shifts change. They also discussed whether it was best to have it done before the divorce settlement was signed the following Monday. The defendant expressed a desire to communicate with Paleski only through Evans because he did not want to use his own phone to call anyone or to coordinate a meeting with Paleski. The defendant indicated that he would get a prepaid phone and then get rid of it. The defendant told Paleski that he would get the money and meet Paleski at the same location at 10 a.m. that same day. The defendant agreed to bring the money to that meeting. The defendant thanked Paleski and exited the vehicle, at which point he was apprehended by Stamford police officers and arrested.

Following a six day trial, a jury found the defendant guilty of attempt to commit murder in violation of §§ 53a-54a and 53a-49 (a) (2), and the court sentenced the defendant to twenty years imprisonment, execution suspended after fifteen years, followed by five years of probation. The defendant appealed, claiming, among other things, that there was insufficient evidence to support his conviction of attempted murder, because the state failed to prove that his conduct constituted a substantial step insofar as he had not yet paid Paleski. *State* v. *Daniel B.*, supra, 164 Conn. App. 322–23, 332. In addressing the defendant's claim, the Appellate Court reviewed our case law and concluded that this court has "frame[d] our criminal attempt formulation in conformance with [§ 5.01 of] the Model Penal Code." upon

which § 53a-49 (a) (2) was based, which focuses on "what the defendant has already done and not what remains to be done." Id., 329. Consequently, that court upheld the defendant's conviction, concluding that a reasonable jury, after watching video footage of the defendant's agreeing to a price to have his wife killed, providing "key information" to effectuate her murder, and planning the manner of the killing, including his own alibi, could have found that the defendant took a substantial step and, therefore, that the defendant's failure to pay Paleski did not render his conduct merely preparatory. See id., 332–34. This certified appeal followed.

The defendant claims that, in concluding there was sufficient evidence to sustain his conviction of attempt to commit murder, the Appellate Court improperly construed § 53a-49 (a) (2). Specifically, the defendant claims that the determination of what constitutes a substantial step in a course of conduct intended to culminate in murder depends on "what remains to be done" as opposed to what "has already been done." The state argues that the Appellate Court properly looked to our case law, which articulates the proper framework under § 53a-49 (a) (2) for determining a substantial step and focuses on what the defendant has already done. We conclude that, in determining whether a defendant's actions constitute a substantial step in a course of conduct planned to culminate in his commission of murder, the proper focus is on what the defendant has already done. Applying that standard in the present case, the Appellate Court properly concluded that the state presented sufficient evidence to permit a jury reasonably to find the defendant guilty of attempt to commit murder under the substantial step subdivision.

We begin with the general principles that guide our review. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty."[5] (Internal quotation marks omitted.) *State* v. *Moreno-Hernandez*, 317 Conn. 292, 298–99, 118 A.3d 26 (2015).

In the present case, the determination of whether there was sufficient evidence to support the defendant's conviction of attempt to commit murder is inextricably linked to a question of statutory interpretation. That is, prior to determining whether there was sufficient

evidence, we must resolve whether the Appellate Court properly construed § 53a-49 (a) (2) to focus on what already has been done rather than what remains to be done. We exercise plenary review over questions of statutory interpretation, guided by well established principles regarding legislative intent. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013) (explaining plain meaning rule under General Statutes § 1-2z and setting forth process for ascertaining legislative intent).

We begin with the statutory language. Our criminal attempt statute proscribes two distinct ways in which a person is guilty of an attempt to commit a crime: through the attendant circumstances subdivision, § 53a-49 (a) (1), or the substantial step subdivision, § 53a-49 (a) (2). This appeal involves the interpretation of the substantial step subdivision, which defines criminal attempt in relevant part as follows: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." General Statutes § 53a-49 (a) (2). Included in the threshold inquiry are our prior interpretations of the statutory language, which we have stated are encompassed in the term "text" as used in § 1-2z. See *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 497–99, 923 A.2d 657 (2007).

We have held that the substantial step inquiry "focuses on what the actor has *already done* and not on what remains to be done." (Emphasis in original.) *State* v. *Lapia*, 202 Conn. 509, 515, 522 A.2d 272 (1987).[6] For example, in *Lapia*, the defendant, Louis Lapia, kidnapped a victim who was mentally disabled and held him for three days. The victim testified that, while captive, he was "bound and blindfolded . . . beaten on three different occasions, and . . . threatened [that Lapia was going] to kill his parents." Id., 513. In addition, the victim testified that Lapia asked him to perform oral sex. Id., 514. When the victim refused, Lapia "tightened the ropes which bound [him] and threatened to beat him again." Id. On appeal, Lapia claimed that the evidence was insufficient to sustain his conviction of attempt to commit sexual assault in the first degree under the substantial step subdivision because his actions did not exceed "mere preparation" when he only requested that the victim perform oral sex. Id., 512, 515. In holding that there was sufficient evidence to find that Lapia attempted to commit sexual assault in the first degree, this court reasoned that "[Lapia's] argument that his conduct 'remained in the zone of preparation' because no sexual assault occurred is without merit. . . . [T]o constitute a substantial step, the conduct must be 'strongly corroborative of the actor's

criminal purpose.' . . . This standard differs from other approaches to the law of criminal attempt in that it focuses on what the actor has *already done* and not on what remains to be done. . . . What constitutes a substantial step in a given case is a question of fact. . . . Under the facts of this case, it was not unreasonable for the jury to conclude that [Lapia] had progressed so far in the perpetration . . . [when he] request[ed] that the [victim] perform oral sex and tighten[ed] the ropes upon his refusal . . . ." (Citations omitted; emphasis in original.) Id., 515–16.

Likewise, in *State* v. *Carter*, 317 Conn. 845, 120 A.3d 1229 (2015), this court addressed a sufficiency of the evidence claim under the substantial step subdivision. The defendant in that case, Kenneth R. Carter, was at a cafe in Groton when two police officers—who had received a tip that Carter intended to shoot someone there—entered the cafe. Id., 848–49. When the officers moved in his direction, Carter raised and pointed a gun at one of them, Brigitte Nordstrom. Id. Carter refused to drop the gun when ordered to do so and eventually " 'turned away toward the bar, with his gun and both of his hands in front of him and his back to Nordstrom . . . .' " Id., 849–50. After apprehending Carter, the officers discovered that Carter was holding a " '.22 caliber Jennings semiautomatic pistol with five rounds in the magazine but none in the chamber.' " Id., 850. Because the gun was not " 'racked' "; id., 851; Carter argued that there was insufficient evidence " 'to prove that [he] intended to cause serious physical injury [under the substantial step subdivision] as required to sustain a conviction [of attempt to commit] assault in the first degree . . . .' " Id., 852.

In rejecting Carter's argument, this court reasoned that it was not necessary for the gun to be racked in order to find Carter guilty of attempt under the substantial step provision. This court stated that "[t]he defendant's claim that he did not rack the gun, even if true, would only support the proposition that he did not take the *next* step to complete the crime which, of course, is irrelevant to the inquiry whether he took a *prior* substantial step to commit the offense. . . . [I]t was only necessary for him to take a substantial step under the circumstances as he believe[d] them to be . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 861; see also *State* v. *Wilcox*, 254 Conn. 441, 468–69, 758 A.2d 824 (2000) (focusing on what defendant had done and not on what he had left to do); *State* v. *Milardo*, 224 Conn. 397, 404, 618 A.2d 1347 (1993) (same); *State* v. *Anderson*, 211 Conn. 18, 28–29, 557 A.2d 917 (1989) (same).

Our prior interpretation of § 53a-49 (a) (2) finds support in the history of the statute. When the legislature codified the crime of attempt and incorporated the substantial step as one of the means by which a defendant

could be held liable, it adopted the substantial step provision from the Model Penal Code. See *State* v. *Moreno-Hernandez*, supra, 317 Conn. 303–304. The Model Penal Code's substantial step provision did not require "a 'last proximate act' or one of its various analogues" in order to "permit the apprehension of dangerous persons at an earlier stage than . . . other approaches without immunizing them from attempt liability." *United States* v. *Jackson*, 560 F.2d 112, 120 (2d Cir. 1977) (citing Model Penal Code § 5.01, comment, pp. 47–48 [Tentative Draft No. 10, 1960]), cert. denied sub nom. *Allen* v. *United States*, 434 U.S. 1017, 98 S. Ct. 736, 54 L. Ed. 2d 726 (1978), and cert. denied, 434 U.S. 941, 98 S. Ct. 434, 54 L. Ed. 2d 301 (1977). The drafters of the Model Penal Code explained that just because "further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial." 1 A.L.I., Model Penal Code and Commentaries (1985) § 5.01, comment 6 (a), p. 329.

Although not the focus of the substantial step provision, the consideration of what the actor has left to do is not completely irrelevant to the inquiry of whether he has taken a substantial step. Because "[a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime . . . the finder of fact may give weight to that which has already been done *as well as* that which remains to be accomplished before commission of the substantive crime." (Emphasis added; internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 180, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006). Accordingly, the defendant is free to emphasize to the jury what he had left to do to commit the crime. The main focus, however, will be on what the defendant "has already done." Model Penal Code and Commentaries, supra, § 5.01, comment 6 (a), p. 329; id., p. 331. We conclude, therefore, that, in holding that there was sufficient evidence to sustain the defendant's conviction of attempt to commit murder under the substantial step provision of § 53a-49 (a) (2), the Appellate Court properly construed § 53a-49 (a) (2) by focusing on what the defendant had already done in determining that his conduct constituted a "substantial step in a course of conduct planned to culminate in his commission" of murder. See *State* v. *Daniel B.*, supra, 164 Conn. App. 334–35.

For two reasons, we find unpersuasive the defendant's reliance on this court's language in *State* v. *Green*, 194 Conn. 258, 277, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985), that "[the] substantial step . . . standard properly directs attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime. . . . This standard shifts the focus from what has been

done to what remains to be done." (Citation omitted; internal quotation marks omitted.) First, *Green* is distinguishable from the present case because the issue presented required us to construe both the attendant circumstances provision and the substantial step provision. That is, in *Green*, this court held that there was sufficient evidence for a jury reasonably to find that the defendant's actions satisfied both the attendant circumstances and substantial step subdivisions of § 53a-49 (a). Id., 276–77. We have emphasized the distinctions between the two provisions, explaining that they "are not coextensive. The substantial step subdivision criminalizes certain conduct that would fall short of violating the attendant circumstances subdivision. . . . For instance, a pickpocket who reaches into an empty pocket would be guilty of attempt to commit larceny under both subdivisions . . . but a pickpocket who is apprehended immediately before reaching into the empty pocket could be found guilty under only the substantial step subdivision and not the attendant circumstances subdivision. Thus, the distinction between the two subdivisions is the degree of completeness each requires in the course of an actor's conduct." (Citations omitted.) *State* v. *Moreno-Hernandez*, supra, 317 Conn. 311.

Second, in *Green*, this court relied on common-law attempt doctrine that predated our legislature's adoption of the substantial step provision.[7] For example, the court in *Green* cited to *State* v. *Mazzadra*, 141 Conn. 731, 736, 109 A.2d 873 (1954), to support its statement that the "acts must be . . . at least the start of a line of conduct . . . ." *State* v. *Green*, supra, 194 Conn. 272. The Commission to Revise the Criminal Statutes rejected that language in its comments to § 53a-49. The commission explained that the substantial step theory of attempt was a "new [concept] . . . used to distinguish acts of preparation from acts of perpetration and is contrasted with criteria specified in . . . *Mazzadra* . . . . This section requires more than a mere start of a line of conduct leading to the attempt." (Citation omitted.) Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 2012) § 53a-49, comment, p. 76. Therefore, in outlining what conduct constitutes an attempt, the court in *Green* cited language from prior case law that our legislature rejected in adopting the substantial step provision. Subsequent to *Green*, this court has held that the substantial step inquiry focuses on what the actor has already done and not what remains to be done.[8] See, e.g., *State* v. *Carter*, supra, 317 Conn. 861; *State* v. *Lapia*, supra, 202 Conn. 515–16.

Relying on this court's prior precedent, the Appellate Court properly held that the focus is on what the defendant had already done rather than what remained to be done. Applying the proper focus to the present case, and construing the evidence in the light most favorable

to sustaining the guilty verdict, we conclude that the Appellate Court properly determined that the state presented sufficient evidence for a jury reasonably to find the defendant guilty beyond a reasonable doubt of attempt to commit murder in violation of § 53a-49 (a) (2).[9] The evidence, which is strongly corroborative of the defendant's intent, amounts to more than a "mere conversation standing alone." *State* v. *Molasky*, 765 S.W.2d 597, 602 (Mo. 1989). The defendant's course of conduct, beginning prior to June 9 and ending with his arrest, provided ample evidence from which the jury could have reliably determined his intent. The state presented evidence of the defendant's motive through testimony about the defendant's pending divorce proceedings and the deteriorating relationship between the defendant and T.[10] Moreover, the state presented evidence that the defendant had begun his planning well in advance of June 9, through testimony that the defendant had told Evans that he had contemplated murdering T for "two years, and he made up his mind" that he was going to do it, and through evidence demonstrating that the defendant had attempted to procure a more recent photograph of her, and had contacted a third party to obtain Evan's telephone number.[11] The fact that the defendant voluntarily contacted Evans, someone he had not spoken to in years, to inquire if Evans knew someone who could murder T,[12] only four days before the dissolution of his marriage to T was set to be finalized, also corroborates the defendant's intent. The evidence also revealed that, after his initial contact with Evans, the defendant continued to exchange a series of texts and made phone calls to Evans over a twenty-four hour period, culminating in the defendant's driving to a rest area to meet a complete stranger who he believed was a "hit man" willing to kill his wife. The jury had sufficient evidence to find that the resulting meeting was more than a mere conversation; rather, it was the culmination of a series of acts all aimed at the same end, procuring a hit man to kill T.

The jury watched the video recording of the defendant entering Paleski's vehicle and providing Paleski with the information necessary to murder T. Specifically, when the defendant entered Paleski's car, he provided Paleski with his wife's name, home address, employer, work address, work schedule, and physical description. The defendant offered Paleski his plan for murdering T, namely, that the killing take place "in a rough section" of Stamford and involve her "nice car" to make it look like an impersonal attack and to ensure that neither the defendant nor his children would be near the scene. The jury watched the defendant leave Paleski's car to retrieve a piece of paper that ultimately provided Paleski with, among other things, the make and model of T's car to effectuate the carjacking scenario that he had concocted. After hearing T's testimony that she refused the defendant's request for a photo-

graph of her one month before, the jury watched the defendant show Paleski an old photograph of T and describe how her hair color had changed since the photo was taken to ensure that Paleski would recognize her. In addition to providing critical information, the defendant planned both the manner of killing and how to secure his alibi. To effectuate the murder, the defendant and Paleski created a structured payment scheme, whereby they agreed on a total price, a down payment amount, and upfront payment amount to be paid by the defendant to Paleski approximately ten hours later. After clarifying the logistics of making the first payment, the jury reasonably could have determined that the defendant made one final indication of his intent when he thanked Paleski before exiting the vehicle. There was more than ample evidence from which the jury could have determined beyond a reasonable doubt that the defendant intended to murder T and, by hiring a hit man, took a substantial step to achieve that goal.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and PALMER, D'AURIA, MULLINS and VERTEFEUILLE, Js., concurred.

* In furtherance of our policy of protecting the privacy interests of the subject of a criminal protective order, we refer to the protected person only by the subject's first initial and decline to identify the defendant or others through whom the subject's identity may be ascertained.

[1] This court granted the defendant's petition for certification to appeal, limited to the following issue: "In concluding that there was sufficient evidence to sustain the defendant's conviction of attempted murder in violation of . . . §§ 53a-54a and 53a-49 (a) (2), did the Appellate Court properly construe § 53a-49 (a) (2) in determining that the defendant's conduct constituted a 'substantial step in a course of conduct planned to culminate in his commission' of murder?" *State* v. *Daniel B.*, 323 Conn. 910, 149 A.3d 495 (2016).

[2] At trial, the parties stipulated that the defendant called Evans four times, at 3:27 p.m., 9:16 p.m., and 11:45 p.m. on June 9, 2011, and at 12:57 a.m. on June 10, 2011, and that Evans called the defendant two times, at 11:56 p.m. on June 9, 2011, and at 12:41 a.m. on June 10, 2011. The defendant also introduced into evidence a text log indicating eight text messages exchanged between the defendant and Evans from 11:25 p.m. on June 9, 2011, to 12:22 a.m. on June 10, 2011. At 11:40 p.m., Evans texted the defendant to tell him that he had found someone that would kill T. One minute later, at 11:41 p.m., the defendant responded and asked Evans when and where they were going to meet.

[3] T testified that state's exhibit 4 was a photograph of her, the defendant, and their newborn daughter at the hospital following their daughter's birth.

[4] Although we cite only to portions of the conversation between the defendant and Paleski, the entire transcript, state's exhibit 11, is jointly appended to the majority and dissenting opinions. We note that the best evidence was the video recording itself, which the jurors viewed, and, therefore, they were able to observe the defendant's conduct, demeanor, and tone and to make credibility findings.

[5] The dissent agrees that the jury was properly instructed on the elements required to find a defendant guilty under the substantial step provision of § 53a-49 (a) (2), and the defendant has not challenged the trial court's charge to the jury. Our inquiry, therefore, is limited to whether, in the light most favorable to sustaining the verdict, there was sufficient evidence for a jury reasonably to find the defendant guilty under the substantial step provision.

[6] In addition to claiming that the Appellate Court misread this court's precedent in concluding that the focus of the substantial step inquiry is on what has been done, the defendant claims that the Appellate Court misread its own case law. We disagree and observe that the Appellate Court properly followed this court's precedent in focusing its inquiry on what has been

done. See, e.g., *State* v. *Hanks*, 39 Conn. App. 333, 341, 665 A.2d 102 ("[the substantial step] standard focuses on what the actor has already done and not what remains to be done" [internal quotation marks omitted]), cert. denied, 235 Conn. 926, 666 A.2d 1187 (1995).

[7] We agree that our law in this area has been less than clear, and we take this opportunity to clarify. We do not cast any doubts, however, on whether *Green* was correctly decided. As we have explained, the statement in *Green* was not central to the holding.

[8] For similar reasons, the defendant's reliance on *Small* v. *Commissioner of Correction*, 286 Conn. 707, 946 A.2d 1203 (2008), is misplaced. *Small* concerned a habeas appeal in which the defendant claimed ineffective assistance of counsel after neither his trial nor appellate counsel challenged the lack of a jury instruction on criminal attempt with respect to the predicate felony attempted robbery for which he was ultimately convicted and upon which one of his convictions of felony murder was based. Id., 709. In concluding that the failure to instruct was harmless, the court made a reference to the statement in *Green* without any analysis of that case or of the cases subsequent to *Green* that have stated that the focus is on what the actor has already done. Id., 730. Like *Green*, therefore, the decision in *Small* did not address the controlling precedent of this court.

Because our decision in the present case clarifies that, contrary to the defendant's contention, this court's precedent that the determination of what constitutes a substantial step depends on what the actor has already done, we reject the defendant's claim, based on *Small*, that the Appellate Court's decision in the present case constitutes a retroactive application of the law that violates his due process rights.

[9] A review of case law from other jurisdictions that have addressed the murder for hire scenario under the Model Penal Code's framework supports our conclusion. See, e.g., *State* v. *Manchester*, 213 Neb. 670, 676, 331 N.W.2d 776 (1983) (holding that evidence was sufficient to constitute substantial step where defendant "made plans for the murder, solicited a killer, discussed the contract price and set the money aside . . . arranged for the weapon and a scope, and showed the killer the victim, his residence, and place of work"); *State* v. *Urcinoli*, 321 N.J. Super. 519, 537, 729 A.2d 507 (App. Div.) (there was sufficient evidence for jury to determine that defendant took substantial step where defendant "showed [hit man] his bank statement to prove that he could pay him [after the fact] . . . provided [hit man] with details concerning the intended victims, including . . . address[es], phone numbers, cars and license plate numbers, physical descriptions . . . [and] daily routine[s]"), cert. denied, 162 N.J. 132, 741 A.2d 99 (1999).

We agree with the dissent that those states—unlike Connecticut—that have *not* adopted the Model Penal Code require the defendant to have taken steps closer to the final act and, in some instances, require a dangerous proximity to success. See *State* v. *Moreno-Hernandez*, supra, 317 Conn. 303–304 (noting that Connecticut adopted substantial step provision from Model Penal Code § 5.01). The Model Penal Code, however, by drawing the line further away from the final act, created "relaxed standards"; *State* v. *Disanto*, 688 N.W.2d 201, 211 (S.D. 2004); that include "in criminal attempt much that was held to be preparation under former decisions." Id., 210. In fact, this court has observed that "[t]he drafters of the Model Penal Code considered and rejected all previous formulations [including the dangerous proximity test] in favor of [the substantial step]." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 181 n.29, 891 A.2d 897 (citing Model Penal Code § 5.01 [1] [c] [Proposed Official Draft 1962]), cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

We also agree with the dissent that the payment of money is *not* "a necessary prerequisite" for a jury to reasonably determine that a defendant committed a substantial step in a murder for hire scenario. Our disagreement with the dissent lies in the application of that principle to the facts of this case. Specifically, the dissent states that, notwithstanding the general rule that the payment of money is not a necessary prerequisite for a jury to find that a defendant took a substantial step in a murder for hire scenario, "the act of making payment in *this* case, on *this* record, became the only reliable indicator of the defendant's actual intentions during the crucial time period at issue." (Emphasis in original.) That conclusion, however, is not reconcilable with the applicable standard of review, which requires this court to view the evidence in the light most favorable to sustaining the verdict. *State* v. *Moreno-Hernandez*, supra, 317 Conn. 298–99. For example, although the dissent claims that "[n]o one can fairly read the full transcript of the conversation without detecting a degree of hesitation and equivocation on the part

of the defendant," the jurors who observed the video of the defendant's conversation with the hit man and reviewed the transcript, along with all of the other evidence of the defendant's conduct prior to the video recorded meeting with the hit man, determined that the defendant's conduct indicated his intent to murder T, as they found him guilty of attempt under the substantial step provision. In addition to all of the actions the defendant took to hire a hit man to kill his soon to be ex-wife, the jury easily could have credited the defendant's own words prior to and during the video recorded meeting to find beyond a reasonable doubt that he intended to murder T. For example, the defendant told Evans he had contemplated murdering his wife for two years, and he described to the hit man that he thought the best way to accomplish T's murder was to stage a carjacking that would provide him with an alibi and divert suspicion away from him. The jurors also heard the defendant discuss the timing of T's murder and whether it would be better for the defendant if T was killed prior to the execution of their divorce settlement. Throughout the more than twenty-four hours that took place between his first call to Evans and his arrest, the defendant had numerous communications with Evans and could have cancelled his request or changed his mind. His words and his conduct over that more than twenty-four hour period, however, established his clear intent to murder T.

Additionally, we disagree that, viewed in the light most favorable to sustaining the verdict, the failure of the defendant to provide money instantly is significant. The time of day was relevant. The jury reasonably could have inferred that the defendant's decision not to withdraw money from a bank at 1:30 a.m. to pay the hit man who had just agreed to murder his wife was born of a desire to avoid being implicated in the murder, rather than an affirmative refusal "to take the one action that . . . would have demonstrated his firm intention to commit the crime . . . ." In fact, he reassured the hit man that he had the money but did not want to get it until the morning because it would look suspicious. The defendant repeatedly states that that the purpose of finding a hit man was to prevent the police from tying him to the killing.

[10] The defendant claims that the Appellate Court improperly focused on only one aspect of the substantial step analysis—namely, whether the focus is on what has been done—and that, had the Appellate Court properly addressed the intent requirement of the attempt statute, it would not have upheld the defendant's conviction. This argument lacks merit, as the Appellate Court analyzed all of the evidence to prove the offense, including the evidence that established intent, and so concluded that the defendant "had been contemplating this course of action for 'two years,' " and, when he met with Paleski, he "agreed to a price (to include a down payment and money for the murder weapon), provided Paleski with key information, namely, his wife's name, home and work address[es], her work schedule, a description of her vehicle, and suggested a day, location, and manner for the murder to ensure that the defendant would have an alibi. [In addition] the jury also saw the defendant twice confirm to Paleski that he wanted his wife murdered." *State* v. *Daniel B.*, supra, 164 Conn. App. 332.

The defendant separately claims that the Appellate Court failed to address how the defendant "act[ed] 'with the kind of mental state required for commission of' " murder, when considering the " 'circumstances as he believed them to be' " at the time, as required under § 53a-49 (a). The jury heard testimony from Evans, however, that the defendant believed he was meeting a hit man at the rest stop. Believing Paleski was a hit man, the defendant provided him with the information necessary to murder his wife and took steps to distance himself from being suspected of participating in the murder. Therefore, looking at the circumstances as the defendant believed them to be, T stood in life threatening danger.

Finally, the defendant claims that the Appellate Court failed to address how the defendant's actions were "strongly corroborative of [his] criminal purpose" under § 53a-49 (b). The Appellate Court concluded, however, that "it was reasonable for the jury to have concluded that a person, with the intent to commit murder who hires a hit man has demonstrated his dangerousness to society." *State* v. *Daniel B.*, supra, 164 Conn. App. 333 n.10. As the defendant himself concedes, the Appellate Court did not need to incorporate a discussion of the statutory examples from § 53a-49 (b) in order to properly construe the substantial step subdivision. See *State* v. *Green*, supra, 194 Conn. 277 ("[t]hese examples are not all-inclusive").

[11] The dissent points out that "[t]here is no evidence that the defendant conducted any surveillance [supposedly of T], obtained or furnished a

weapon, [or] 'cased' the potential crime scene [which was T's place of employment]," and cites *State* v. *Damato*, 105 Conn. App. 335, 343–45, 937 A.2d 1232, cert. denied, 286 Conn. 920, 949 A.2d 481 (2008), to make the same point. However, unlike the victim in *Damato*, T was not a stranger to the defendant, and he did not need to conduct surveillance to know where she resided and worked. Rather, like the defendant in *Damato*, it is relevant that the defendant came prepared to the meeting with all the information the hit man would need to locate and murder T. As we have explained, our analysis properly focuses on the evidence that *was* presented, viewed in the light most favorable to sustaining the verdict. The defendant's meeting with the hit man, a complete stranger, in the middle of the night at a rest area off the highway was more than a mere conversation to vent about his frustration of not seeing his children earlier that day. It was, as the jury concluded, an attempt to murder T.

[12] The defendant also claims that, by focusing on what the actor has already done to commit the crime, we will extend attempt liability beyond what was intended by the legislature because the approach will blur the line between attempt and solicitation. We disagree. We have observed that "the inciting or urging, whether it be by a letter or word of mouth, is a mere solicitation . . . ." *State* v. *Schleifer*, 99 Conn. 432, 438, 121 A. 805 (1923). "An attempt [on the other hand] necessarily includes the intent, and also an act of endeavor adapted and intended to effectuate the purpose. . . . The act [or] endeavor must be some act done in part execution of a design to commit the crime." (Citation omitted; internal quotation marks omitted.) Id.; see also Model Penal Code and Commentaries, supra, § 5.02, comment 3, p. 373 ("this section provides for separate definition of criminal solicitation on the ground that each of the two inchoate offenses presents problems not pertinent to the other").

The present case provides a clear example of the distinction between solicitation and attempt as articulated in *Schleifer*. The defendant first solicited Evans to find a hit man. Had Evans refused, there would necessarily be no act or endeavor that followed to constitute attempt. The state presented sufficient evidence, however, that the defendant had taken steps before contacting Evans, believed Evans found a hit man, and took steps to create a plan under which he would not be targeted as the killer. Unlike the dissent's contention that this was "mere conversation" amounting to "two solicitations," a jury reasonably could have found that the defendant's conduct that followed his initial contact with Evans constituted an attempt, as the defendant's outward acts—which included driving to the rest area, getting in Paleski's car, giving Paleski a piece of paper with information on it, and showing Paleski a photograph of his wife—evinced an intent to have his wife murdered.

Furthermore, we reject the defendant's argument that the police should have waited until the defendant gave Paleski some money the next morning before arresting him. Payment is not necessary for a jury to determine that a defendant's conduct constituted a substantial step in a murder for hire scenario. See, e.g., *State* v. *Urcinoli*, 321 N.J. Super. 519, 537, 729 A.2d 507 (App. Div.), cert. denied, 162 N.J. 132, 741 A.2d 99 (1999). In addition, knowing the defendant's intent to follow through with the plan, the police would have put T's life in jeopardy, because the defendant, whose prior conduct against T led her to call the police multiple times and to obtain multiple protective orders against him, could have decided that he did not want to pay Paleski and could have killed her himself. Research in the field of domestic violence has identified certain factors that create a greater risk of violence or lethality. A well recognized factor that can increase risk to victims is the finalization of a divorce or separation. See, e.g., J. Campbell et al., "Intimate Partner Homicide: Review and Implications of Research and Policy", 8 Trauma, Violence & Abuse 246, 254 (2007) (noting that divorce and separation increase woman's risk of experiencing lethal violence); L. Dugan et al., "Exposure Reduction or Retaliation? The Effects of Domestic Violence Resources on Intimate-Partner Homicide," 37 L. & Society Rev. 169, 193 (2003) (noting that "increases in divorce are also related to more killings of spouses . . . [which] is not entirely surprising in light of prior research showing that the most dangerous time in a relationship is as it is ending," and citing to various scholars on the subject, including Jacquelyn C. Campbell). In the present case, the defendant called Evans four days before his dissolution from T was to be finalized. Coupled with the history of domestic violence known to law enforcement at the time of the arrest, the risk in this case was real. Many courts have opined that "failing to attach criminal responsibility to the actor—and therefore prohibiting law

enforcement officers from taking action—until the actor is on the brink of consummating the crime endangers the public and undermines the preventative goal of attempt law." *State* v. *Reeves*, 916 S.W.2d 909, 913–14 (Tenn. 1996), citing *United States* v. *Stallworth*, 543 F.2d 1038, 1040 (2d Cir. 1976).

The defendant's additional claim that the Appellate Court's construction of § 53a-49 (a) (2) will result "in a lower threshold of conduct constituting a substantial step," because the defendant's conduct was "closer in nature to the acts necessary [for] conspiracy," which requires " 'a [less] demanding showing' " than proof of a substantial step merits little discussion. Our legislature set forth the crimes of conspiracy and attempt in different sections of our Penal Code, and the two sections remedy different conduct. Compare General Statutes § 53a-48 with General Statutes § 53a-49. In the present case, regardless of whether the defendant's conduct would satisfy the elements required for conspiracy under § 53a-48, a jury reasonably could have found that his conduct amounted to a substantial step under § 53a-49 (a) (2).

----