******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MAURICE FRANCIS
## (AC 42443)

Prescott, Bright and Sheldon, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of murder in connection with the death of the victim, the defendant appealed. The defendant's conviction stemmed from an incident in which he caused the victim's death, dragged her body out of their shared apartment, drove to a used car shop where the body was left in the defendant's vehicle all day until the defendant drove back to the apartment and put the body in a bathtub, after which he made a 911 phone call claiming that he found the victim in the bathtub. At trial, the court denied the defendant's motion for a judgment of acquittal, which was made at the close of the state's case-in-chief, the defendant rested without putting on evidence, and the jury found the defendant guilty of murder. *Held*:

1. The trial court properly denied the defendant's motion for a judgment of acquittal, as there was sufficient evidence for the jury to have found the defendant guilty of murder beyond a reasonable doubt: even though the defendant claimed that there was insufficient evidence to establish that he caused the victim's death or that he had the specific intent to cause her death, the defendant conceded that there was sufficient evidence to support an inference that he dragged the victim's body out of their apartment, down the stairs and across the grass, that he put the body into his vehicle and drove, in broad daylight, to a used car shop, where he left the body in his vehicle all day, and that he subsequently transferred the body to another vehicle and drove the body back to the apartment, where he remained for several hours before calling 911, and, therefore, the evidence was more than sufficient for the jury to have concluded that the defendant intended to kill the victim and did succeed in killing the victim; moreover, there was substantial evidence of consciousness of guilt, including that the defendant declined to provide emergency assistance to the victim and repeatedly lied to the police and emergency personnel, and the jury could have inferred an intent to kill from the infliction of numerous superficial wounds caused by a sharp weapon, followed by the defendant's failure to summon help as the victim bled to death.

2. The defendant could not prevail on his claim that this court should change its long-standing standard of review with respect to sufficiency of evidence claims to a more rigorous standard that would require this court to determine if there was a reasonable view of the evidence that would support a hypothesis of innocence; our Supreme Court recently addressed and rejected a similar claim, determining that a reviewing court does not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence but, rather, asks whether there is a reasonable view of the evidence that supports the jury's verdict of guilty, and as an intermediate appellate court, it was not within this court's power to overrule Supreme Court authority.

Argued October 17—officially released December 31, 2019

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Crawford, J.*; thereafter, the court denied the defendant's motion for a judgment of acquittal; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Conrad Ost Seifert*, assigned counsel, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Donna Mambrino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, Maurice Francis, appeals from the judgment of conviction rendered by the trial court of one count of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that the court improperly denied his motion for a judgment of acquittal[1] because there was insufficient evidence to establish that he caused the death of the victim[2] or that he had the specific intent to cause the death of the victim. In the alternative, the defendant requests that we change our long-standing standard of review with respect to insufficiency of evidence claims, so that we review the evidence under a much more rigorous standard to determine if there is a reasonable view of the evidence that would support a hypothesis of innocence. We affirm the judgment of the trial court.

The following evidence, which was admitted at trial, and relevant procedural history inform our review. The victim and the defendant lived together in an apartment building located at 47 Berkeley Drive in Hartford. The victim was employed as a school bus monitor with Specialty Transportation (Specialty), which was previously known as Logisticare. She had worked in that position for approximately four or five years. Her supervisor was Timothy Gamble. Gamble described the victim as "happy, always smiling, [and] coming to work on time every day . . . ." Gamble stated that when the victim began dating the defendant, however, she changed. The victim then began to come to work with cuts, bruises, and other injuries to her body. Her disposition changed. On more than one occasion, she arrived at work with a bloodied shirt and injuries. On one specific occasion, she arrived at work wearing dark glasses in an attempt to hide her blackened eye. As time went on, Gamble became so concerned for the victim that he invited her to move in with him and his wife, an offer which the victim declined. He also suggested that she go to a women's shelter, which she also declined.

On the morning of Saturday, November 1, 2008, at approximately 8:30 a.m., Beverly Copeland, who lived across the street from the defendant and the victim, left her apartment. As Copeland went to get into her vehicle, which was parked in front of her building, she saw a black male standing, looking down at the grass in front of his apartment building. At first, Copeland thought the man was looking at a pile of clothing in the grass. When the man bent down to pick up what was in the grass, Copeland realized that it was not a pile of clothing, but, rather, it was the body of a woman, who had braids in her hair. Copeland then saw the man put the woman's body over his shoulders. After taking a couple of steps, the man put down the woman and then began to drag her by the hands and arms across the street, as her back dragged along the ground. The woman, herself, did not move. After the man got to a

silver Volvo station wagon that was parked across the road, he put the woman's body into the front passenger's seat. Still, the woman did not move. The man then got into the driver's seat of the silver Volvo station wagon and began to drive away; Copeland wrote down the license plate number, which was 110-XDZ.[3]

The defendant drove the silver 1998 Volvo station wagon (1998 Volvo), with the woman's body in the passenger's seat, to Sparks Motor Sales in Hartford (Sparks). When he arrived at approximately 9 a.m., he telephoned Garth Wallen, the owner of Sparks, who was still at home. The defendant had purchased his 1998 Volvo from Sparks the previous month, and he recently had made arrangements with Wallen to exchange that vehicle for a different vehicle. When Wallen arrived at Sparks, the defendant was standing beside his 1998 Volvo, which was parked in front of the locked driveway gate. Wallen then opened the gate so they could enter. Wallen saw a woman in the passenger's seat, whom he recognized to be the defendant's girlfriend, but the woman did not speak or make any gestures. The defendant then drove the 1998 Volvo down the driveway, parking it with the driver's side of the vehicle along the wall of the building, facing a wooden fence, in an area where a dumpster generally is kept but which was not present at that time. The defendant got out of his vehicle, leaving the woman inside. The defendant was "hanging around" at Sparks until approximately 4 p.m., when Wallen obtained a 1999 Volvo for him to test drive for the weekend. The woman never got out of the defendant's vehicle during the six or seven hours it was parked at Sparks, used the bathroom, or looked at the 1999 Volvo when it was brought over. The defendant, however, at one point during the day, asked Wallen if it would be okay if he got his girlfriend a cup of water; Sparks had a rented Poland Spring dispenser with cups.

After obtaining the 1999 Volvo, the defendant moved the 1998 Volvo and aligned it beside the 1999 Volvo, passenger side to passenger side, in the "back section" of Sparks. Wallen, thereafter, was busy assisting a customer. He noticed, however, that the defendant later moved the 1998 Volvo back to where he had parked it in the morning, alongside the wall of the building. The defendant also took the plates off his 1998 Volvo and put them on the 1999 Volvo, hung the keys to his 1998 Volvo in the garage, and drove away in the 1999 Volvo. Because the windows of the 1999 Volvo were tinted, Wallen could not see the defendant's girlfriend inside the 1999 Volvo as the defendant drove away in the vehicle. The defendant and Wallen had made plans that they would wrap up the paperwork for the purchase of the 1999 Volvo the following week. They had no plans to talk again until then. The defendant, however, telephoned Wallen later that day, after leaving Sparks, and he told Wallen that a kid in his neighborhood really

liked the 1999 Volvo and that he just wanted Wallen to know.

At 10:50 p.m. that night, the defendant called 911, and he told the dispatcher he had just returned home when he found the victim in the bathtub, after having spoken to her on the phone approximately a half hour or an hour before;[4] the front door was open when he returned home and every light was on; he had dropped off the victim at home a "couple of hours ago"; the victim had no pulse when he found her; he did not want to attempt CPR on her; he did not want to touch the victim; the victim had been having problems with a neighbor who had psychological problems; the victim was kind of "retarded"; the victim had been having mental problems and problems like "falling down the stairs," which could be verified by hospital records; the victim had a cut over her left eye; the victim had been with him all day; and he could provide "proof" that she had been with him from the owner of a car dealership.

At approximately 11 p.m., Michael DiGiacamo, a firefighter with the Hartford Fire Department, arrived at 47 Berkeley Drive. The defendant, who was standing outside, directed DiGiacamo to his second floor apartment. Upon entering the apartment, DiGiacamo saw the victim lying in the bathtub. She was naked, dry, cold and unresponsive; the bathtub contained no water or blood. DiGiacamo and another firefighter removed the victim from the tub and began CPR; the victim still did not respond. DiGiacamo noticed that the victim had "multiple wounds and laceration type stab wounds" on her body. Additional emergency medical personnel arrived and continued CPR. While the paramedics were attending to the victim, DiGiacamo went into the living room where the defendant was speaking with a lieutenant from the fire department. The defendant repeatedly asked if the victim was dead. DiGiacamo thought this was odd because, in his experience, most people ask whether a victim is okay, not whether a victim is dead.

In an interview conducted at the Hartford Police Department on November 2, 2008, the defendant told Detective R. Kevin Salkeld that, on the morning of November 1, 2008, after showering at 8 a.m., he and the victim went to Sparks in his 1998 Volvo. He stated that the victim stayed in the passenger's seat of the car all day while he did odd jobs for Wallen until approximately 5 p.m.[5] The defendant told Salkeld that he brought the victim five bottles of water during the day, which she drank.[6] The defendant also told Salkeld that he went to Sparks because he wanted to pick up a 1999 Volvo to test drive for the weekend, which is the car in which he and the victim drove home after he did the odd jobs throughout the day. The defendant also told Salkeld that he unlocked the door for the victim when they arrived home, and that he then returned to Sparks to help Wallen clean up, and although it was the victim's

habit to lock the doors, when the defendant returned home the front door was open.[7] According to the defendant, he was supposed to meet Wallen at Wallen's home after the cleanup, and, although he went to Wallen's home, Wallen never came;[8] the defendant stated that he waited at Wallen's home and that he repeatedly telephoned Wallen until approximately 10:30 p.m., but Wallen did not answer the calls;[9] the defendant told Salkeld, however, that he did not remember Wallen's home address. The defendant told Salkeld that after waiting for Wallen, he returned home, found the door open, and saw the victim lying in the bathtub; he then called 911.[10]

At approximately 7:12 a.m., on November 2, 2008, Detective Ramon Baez from the Hartford Police Department Crime Scene Division, began to process the scene of the victim's death. One of the items Baez processed was a clump of braided hair that he discovered in front of the apartment building. John Schienman, a forensic science examiner from the Division of Scientific Services, performed DNA testing on the roots of several pieces of hair from the clump that was found by Baez, and he determined that the DNA found on those hair roots was consistent with the victim's DNA profile.[11] Baez also found numerous small blood stains throughout the defendant's apartment.[12] Dr. Schienman testified that DNA in the swabs of those stains also was consistent with the victim's DNA profile.

Inspector Claudette Kosinski, also from the Hartford Police Department Crime Scene Division, processed the two Volvo vehicles. In the 1998 Volvo, Kosinski took samples from two stains in the front passenger's seat that appeared to be blood; the presence of blood was confirmed by Jane R. Codraro, a forensic biologist, from the state's Forensic Science Laboratory. Dr. Schienman performed a DNA analysis of the DNA from these blood stains and determined that the DNA was consistent with the victim's DNA profile.[13]

On November 3, 2008, Susan Williams, an associate medical examiner and forensic pathologist, performed an autopsy of the victim. Dr. Williams found that the victim's eyes were cloudy, demonstrating "decompositional changes," and that she had "multiple small cuts or incised wounds[14] over her body, as well as many small linear . . . scars all over her body." (Footnote added.) The victim had very little blood remaining in her body. The victim had a fresh three-quarter inch linear incised wound on the upper right area of her forehead, a fresh one and one-half inch linear incised wound "over her left eyebrow extending . . . down onto her face," and another fresh linear incised wound on her left upper eyelid; she also sustained a "fracture of the skull of her orbital ridge" that was a "sharp forced injury," meaning it was caused by "a knife or a machete," rather than a fall or a hit with something akin to a baseball bat. The victim also had a fresh incised

wound to the right side of her abdomen and several on her arms, legs, back, and chest; she also had blunt force bruising to her back, wrist, and legs. She had no alcohol or illegal drugs in her system. Dr. Williams concluded that the victim was the victim of a homicide, brought about by "multiple sharp forced injuries"; Dr. Williams opined that the victim "did not have enough blood in her system . . . to sustain [her] life."

Following the testimony of Dr. Williams, the state rested, and the defendant moved for a judgment of acquittal, arguing that the state had not established a prima facie case; the court denied the motion, and the defense rested without putting on evidence. Following closing arguments and the court's charge to the jury, the jury found the defendant guilty of murder. The court accepted the jury's verdict and, thereafter, rendered a judgment of conviction, sentencing the defendant to fifty years of incarceration. This appeal followed.

The defendant claims that the court improperly denied his motion for a judgment of acquittal. He argues that the evidence was insufficient to establish that he caused the death of the victim or that he had the specific intent to cause the death of the victim. We are not persuaded.

The following general principles guide our review. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Daniel B.*, 331 Conn. 1, 12, 201 A.3d 989 (2019).

"[T]he jury must find every element [of a crime] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 187, 193 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

"[I]t does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 504, 180 A.3d 882 (2018).

"[T]he state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually [proven] by circumstantial evidence . . . ." (Internal quotation marks omitted.) *State* v. *Bonilla*, 317 Conn. 758, 766, 120 A.3d 481 (2015). "Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 504.

The defendant argues that the state's case was based on circumstantial evidence and that "the jury resorted to speculation when it found [that he] caused [the victim's] death" and that he "had the specific intent to kill [the victim]." In his reply brief, the defendant argues: "The defendant agrees with the state that there is sufficient factual evidence to support the jury inferring that the defendant dragged the already dead body of [the victim] out of the apartment, down the stairs, and dragged it across the grass, put it into his 1998 Volvo and drove, in broad daylight, to Mr. Wallen's used car shop on November 1, 2008. And, the jury could possibly infer that somehow, without being seen by anyone while her body sat upright in the defendant's 1998 Volvo with no tinted windows for hours on end, the defendant then transferred her body to the 1999 Volvo which Mr. Wallen allowed the defendant to have in trade for the 1998 Volvo. The defendant, for whatever unknown reason, then drove the body back to their apartment, got the . . . body up the stairs and into the bathtub. . . . A few hours later, the defendant called 911. Bringing the body back to the apartment in his new car makes no logical sense, but, ignoring the bizarre nature of the conduct for a moment, all of this inferred postdeath conduct fails to prove murder." We conclude that the evidence was sufficient for the court to have denied the defendant's motion for a judgment of acquittal and

for the jury to have found him guilty of murder beyond a reasonable doubt.

Although we recognize that "the jury could not properly have inferred an intent to commit murder from the mere fact of the death of the victim, [or] even from her death at the hands of the defendant"; (internal quotation marks omitted) *State* v. *Otto*, 305 Conn. 51, 67, 43 A.3d 629 (2012); we conclude that the evidence in this case was more than sufficient for the jury to have concluded that the defendant intended to kill the victim and indeed succeeded in killing the victim.

As conceded by the defendant, the jury reasonably could have found that he dragged the victim's dead body out of the apartment, down the stairs, across the lawn, and into his 1998 Volvo, that he then drove her to Sparks where he left her body in his vehicle all day, that he thereafter transferred her body into the new 1999 Volvo and drove her home, that he then dragged her back into the apartment and put her in the bathtub, that he remained in the apartment for several more hours, and that he then called 911 to report her death. See id., 68 (defendant's failure to summon medical help to render aid to victim supports an "antecedent intent to cause death" [internal quotation marks omitted]). The evidence also proved that the victim died as a result of multiple incised wounds all over her body that caused her to bleed to death, that by the time the defendant called 911, the victim had very little blood in her body, that her blood was throughout the apartment, on doors, walls, and floors, and that it was in the 1998 Volvo, on the passenger's seat. Several of the incised wounds were in areas of her body, including her back, where the victim could not have inflicted them on herself. There also was evidence from which the jury reasonably could have inferred that the defendant physically assaulted the victim on multiple occasions, leaving her cut, bruised and bloodied.

In addition to this evidence, there was substantial evidence of consciousness of guilt, including that the defendant declined to provide emergency assistance to the victim when he did not call 911 on the morning of November 1, 2008, but, instead, dragged her body down the stairs and across the lawn at approximately 8:30 a.m., kept her in a vehicle for up to seven hours, in an apparent attempt to construct an alibi, and failed to call 911 until 10:50 p.m.; he lied both to the 911 dispatcher and to Detectives Salkeld and Condon when he told them that he had been out in the 1999 Volvo and had just returned home when he found the victim and called 911; he lied to the police about having plans with Wallen in the evening of November 1, 2008; he lied to the police about having gone to Wallen's home in the evening of November 1, 2008; he lied to the police about having returned to Sparks to help Wallen clean up in the early evening of November 1, 2008; he lied to

the police about having telephoned Wallen repeatedly over a period of several hours; and he lied to the 911 dispatcher and to the police about having telephoned the victim shortly before calling 911. Our Supreme Court has explained: "[C]onsciousness of guilt evidence [is] part of the evidence from which a jury may draw an inference of an intent to kill." *State* v. *Sivri*, 231 Conn. 115, 130, 646 A.2d 169 (1994); see *State* v. *Otto*, supra, 305 Conn. 72–73.

In fact, the evidence in this case is similar to, if not stronger than, the evidence our Supreme Court held was sufficient to convict the defendant in *Sivri*. In *Sivri*, the defendant was convicted of murdering the victim in his home even though the victim's body was never found. *State* v. *Sivri*, supra, 231 Conn. 130. Although there was significant evidence that the victim was killed in the defendant's home, and blood of the same type as the victim's was found in the defendant's car, the defendant argued that there was insufficient evidence to prove that he had the specific intent to kill the victim. Id., 121–26. Our Supreme Court noted that there was no evidence of a body, no evidence of a specific weapon used, no evidence of the specific type of wound inflicted on the victim, and no evidence of "prior planning, preparation or motive." Id., 127. Nevertheless, the court pointed to various pieces of circumstantial evidence from which the jury could infer that the defendant intended to kill the victim. Id., 127–31.

First, the court noted that the amount of blood of the victim's blood type found in the defendant's home was significant, representing "approximately one-fourth of the total blood in the body of a woman of average build." Id., 128. In the present case, Dr. Williams testified that the victim died from a slow loss of blood that resulted in her body going into shock because there was insufficient blood to make a pulse and keep her heart beating. Dr. Williams further testified that a person enters into an irreversible shock when she loses approximately 40 percent of her blood. The jury reasonably could have inferred from the victim's extensive slow blood loss that the defendant intended to kill the victim because he allowed her slowly to bleed to death from her wounds.

Second, the court in *Sivri* noted that there was sufficient evidence from the amount of blood present in the defendant's home to support the inference that the victim's fatal wound was caused by a weapon. Id. In the present case, Dr. Williams testified that the victim's fatal wounds were caused by a weapon, in particular, "a sharp instrument, such as a knife, or a machete, or the sharp end of a scissor."

Third, in *Sivri*, the state's expert testified that the amount of blood found in the defendant's home required the weapon used to cut very deeply into the victim's body or to have cut a vein or artery. *State* v. *Sivri*,

supra, 231 Conn. 128. The court concluded that the jury could infer from this testimony that the weapon the defendant used had an edge or point and had been used vigorously enough to cause massive bleeding. Id., 128–29. In the present case, as noted previously, Dr. Williams testified that the victim's wounds were caused by a sharp edged weapon. Although, unlike in *Sivri*, the victim in the present case died from slow blood loss from multiple wounds, as opposed to massive blood loss from a single wound, the jury could have inferred an intent to kill from the methodical infliction of numerous superficial wounds, followed by the defendant's failure to summon medical help as the victim slowly bled to death.

Fourth, in *Sivri*, the court noted that the jury could have inferred that the victim's death occurred in the defendant's family room, a room not likely to have weapons readily at hand, suggesting that the defendant either had such a weapon in his possession while he was in that room or had purposefully obtained the weapon from another room of the house and brought it into the family room to kill the victim. Id., 129. In the present case, the jury reasonably could have inferred that the defendant's actions were purposeful from the fact that he methodically used a weapon to inflict multiple wounds all over the victim's body.

Fifth, in *Sivri*, the court noted the defendant's failure to summon medical assistance for the victim as evidence that the defendant intended to cause her death. Id. Similarly, in the present case, the defendant did not summon medical assistance on the morning of November 1, 2008. Instead, he dragged the victim's body from the apartment, placed her in his car, and kept her there for hours before returning her to the apartment, undressing her, and placing her in the bathtub. This course of conduct is particularly relevant to the defendant's intent because of the slow manner in which the victim died, as her blood drained from her body. The defendant had more time to summon help to save the victim's life than would have been the case if the victim had been subjected to a single grievous injury.

Finally, the court in *Sivri* relied on the defendant's actions *after* the victim's death to show a consciousness of guilt as evidence of his intent to kill the victim. Id., 130. In the present case, the jury was presented with very strong consciousness of guilt evidence, including the defendant's failure to aid the victim as she bled out, dragging the victim's body to his 1998 Volvo, leaving her in that vehicle all day, dragging her back to his apartment, and repeatedly lying to emergency personnel.

In sum, we conclude that there was sufficient evidence for the jury reasonably to have inferred that (1) On November 1, 2008, the defendant killed the victim; (2) the defendant used a weapon with a sharp edge

repeatedly to cut or penetrate the body of the victim, in such a manner as to cause the victim to lose much of the blood that was in her body; (3) the defendant, after inflicting the many wounds, failed to summon medical assistance for his victim and, instead, allowed her to bleed out; (4) the defendant dragged her body down the stairs, across the lawn and into his 1998 Volvo, driving her to Sparks for the day and then returned her body to their apartment and placed her in bathtub; (5) even after returning from this day long expedition, the defendant still waited nearly six more hours before calling 911; and (6) the defendant repeatedly lied to the 911 dispatcher and to the police. Viewing all of this evidence together, we conclude that its cumulative force reasonably supports the inference that the defendant intended to kill the victim and succeeded in doing so.

The defendant also asks that we change our long-standing standard of review so that we review the evidence under a much more rigorous standard to see if there is a reasonable view of the evidence that would support a hypothesis of innocence. Our Supreme Court addressed and rejected a similar request in *Sivri*, stating: "This, of course, would be directly contrary to our traditional scope of review of jury verdicts, and to the way in which we traditionally employ it. Under that scope of review and application, we give deference not to the hypothesis of innocence posed by the defendant, but to the evidence and the reasonable inferences drawable therefrom that support the jury's determination of guilt. On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." Id., 134. Our Supreme Court very recently confirmed this standard of review in *State* v. *Daniel B.*, supra, 331 Conn. 12. As an intermediate appellate court, it is not within our power to overrule Supreme Court authority. See *State* v. *Fuller*, 56 Conn. App. 592, 609, 744 A.2d 931, cert. denied, 252 Conn. 949, 748 A.2d 298, cert. denied, 531 U.S. 911, 121 S. Ct. 262, 148 L. Ed. 2d 190 (2000).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "[W]hen a motion for [a judgment of acquittal] at the close of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without [forgoing] the right to put on evidence in his or her own behalf. The defendant's sole remedy is to remain silent and, if convicted, to seek reversal of the conviction because of insufficiency of the state's evidence. If the defendant elects to introduce evidence, the appellate review encompasses the evidence in toto." (Internal quotation marks omitted.) *State* v. *Seeley*, 326 Conn. 65, 67 n.3, 161 A.3d 1278 (2017); see Practice Book § 42-41. In the present case, the defendant rested following the court's denial of his motion for a judgment of acquittal.

[2] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to use the victim's full name. See General Statutes § 54-86e.

[3] Copeland later gave the license plate number and a description of the

vehicle to the police, who determined that the license plate was registered to the defendant's silver 1998 Volvo station wagon. At trial, Copeland positively identified photographs of the defendant's silver 1998 Volvo station wagon, as well.

[4] Andrew Weaver, who was a member of the Hartford Police Department in November, 2008, and was trained in computers, cell phones, and cell phone call data mapping, testified that the defendant's cell phone was not used to call the victim's cell phone on November 1, 2008.

[5] Wallen testified that the defendant was "hanging around" Sparks all day but that he did not do any odd jobs.

[6] Wallen testified that Sparks had a Poland Springs water dispenser that used cups and that the defendant asked once to bring the victim a cup of water.

[7] Wallen testified that the defendant did not return to Sparks that evening, and that he closed up shortly after the defendant left.

[8] Wallen testified that he and the defendant did not have plans to meet up later that evening, and that the defendant telephoned him the following day to tell him about the victim's death and to suggest to him that he "remember" that the defendant was supposed to come back to Sparks the previous evening to help Wallen clean up. Wallen said that he told the defendant that he did not want to hear it, and he hung up the telephone.

[9] Weaver testified, however, that no phone calls were made by the defendant's cell phone to Wallen's cell phone after 4:45 p.m.

[10] Salkeld testified, however, that both he and Detective Seth Condon, the lead investigator on the victim's suspicious death, who had since passed away, were at the scene after the defendant called 911. Salkeld explained that the defendant also had stated at that time that he had just returned home and found the victim and that Condon then walked over to the 1999 Volvo and felt the hood, which was cold to the touch. The defendant, thereafter, complained of chest pains and had to be taken to the hospital.

[11] For example, Dr. Schienman testified that, as to one of the hair roots, labeled as 2Z3, "the expected frequency of individuals who could be the source of item 2Z3, was less than one in seven billion in [population groups consisting of African Americans, Caucasians, and Hispanics]."

[12] Baez also saw several towels that appeared to be soaked with water and blood in the bathroom where the victim's body was found. The towels, however, were not examined by the forensic science laboratory.

[13] Dr. Schienman testified that "the expected frequency of individuals who could be the source [of the DNA on the blood stains from the passenger's seat of the 1998 Volvo] is less than one in seven billion in the three population groups."

[14] Dr. Williams explained that an incised wound is "a wound made by a sharp instrument, such as a knife or a machete or the sharp end of a scissor. The edges are smooth . . . and it cuts through the tissue below it. . . . [A]n incised wound is wider on the skin [than] it is deep, as opposed to, for instance, a stab wound."